**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

JOHN NORMAN HUFFINGTON
c/o Saller Ernstberger & McElroy
10 South Street, #600
Baltimore, MD 21202
(County of Residence: Worcester County)

      Plaintiff,

v.

DAVID SANEMAN, in his personal/individual
capacity
1618 Morse Road
Forest Hill, MD 21050
(County of Residence: Harford County),

DIANA CASSILLY, as Personal Representative
of the ESTATE OF JOSEPH IGNATIUS
CASSILLY, deceased, in both his official and
personal/individual capacity
402 Old Joppa Road
Fallston, MD 21047
(County of Residence: Harford County),

Personal Representative To Be Named of the
ESTATE OF WILLIAM VAN HORN,
deceased, in his personal/individual capacity

BERNADETTE M. PICHA, as Personal
Representative of the ESTATE OF WESLEY J.
PICHA, deceased, in his personal/individual
capacity
1461 Jarrettsville Rd
Jarrettsville, MD 21084
(County of Residence: Harford County),

Personal Representative To Be Named of the
ESTATE OF GERARD COMEN, deceased, in
his personal/individual capacity

and

HARFORD COUNTY (MARYLAND)
Serve on: Bob Cassilly, County Executive

**JURY TRIAL DEMANDED**

Harford County Government
220 South Main Street
Bel Air, MD 21014

    Defendants.

# COMPLAINT

Plaintiff John Huffington, by and through his counsel, Saller Ernstberger & McElroy; Hart McLaughlin & Eldridge, LLC; and Romanucci & Blandin, LLC, states as follows for his Complaint against Defendants David Saneman, in his personal/individual capacity; Diana Cassilly, as Personal Representative of the Estate of Joseph Ignatius Cassilly, deceased, in both his official capacity and personal/individual capacity; Personal Representative To Be Named of the Estate of William Van Horn, deceased, in his personal/individual capacity; Bernadette M. Picha, as Personal Representative of the Estate of Wesley J. Picha, deceased, in his personal/individual capacity; Personal Representative To Be Named of the Estate of Gerard Comen, deceased, in his personal/individual capacity; and Harford County (Maryland):

## OVERVIEW OF THE ACTION

1.    Over 40 years ago, then-18-year-old John Huffington was wrongfully convicted for the murders of Joseph Hudson, Jr., and Diane Becker.

2.    John is innocent. Nonetheless, he spent over 32 years in prison—10 on death row—due to the brazen misconduct of investigators and prosecutors.

3.    Indeed, the State of Maryland disbarred Defendant Joseph Ignatius Cassilly, the Harford County State's Attorney for 36 years, for his misconduct in John's case. Mr. Cassilly did not act alone, however. Several Harford County investigators fabricated and coerced knowingly false witness statements and withheld material, exculpatory evidence. This serial misconduct led to John's conviction.

4.      From the outset, Harford County investigators zeroed-in on a 25-year-old man named Deno Kanaras for the murders. Mr. Kanaras was the son of a well-known local businessman, whose restaurant was a fixture in the community and sat in the parking lot of the Harford County Sheriff's Office investigating the murders.

5.      Yet the Sheriff's Office and Harford County State's Attorney's Office embarked upon a knowingly improper investigation which deferred to the Kanaras family. Investigators alerted Deno Kanaras' father of the investigation, permitted Deno hours to clean and doctor evidence of the crime in front of investigators, and rather than obtain a search warrant of the Kanaras home for evidence, permitted the Kanaras family to select the evidence to turn-over. In turn, Harford County investigators used Deno to fabricate a patently false and ever-evolving story implicating John, who had been with Deno and the victims earlier on the night of the murders.

6.      Numerous witnesses and other evidence demonstrated that Deno was lying and that John was innocent. However, Harford County investigators preserved their fabricated narrative by withholding that exculpatory evidence.

7.      It took John over 30 years to uncover investigators' mendacity in failing to disclose exonerating evidence, including letters to then-State's Attorney Cassilly from the U.S. Department of Justice telling him that forensic evidence he had used to convict John was false.

8.      By 2017, Mr. Cassilly agreed to drop the case against John in exchange for an *Alford* plea, whereby John maintained his innocence. In those 36 long years since he was first arrested, John never once wavered in his declaration of innocence. He continues that declaration today.

9.      Upon his release, John found employment and went to work on behalf of released prisoners reentering society. His efforts led to the admiration of those in non-profit, business, and governmental sectors across Maryland and the United States. John now regularly trains law enforcement cadets on avoiding the tactics that lead to wrongful convictions.

10.     John's tireless work culminated in a full innocence pardon for the murders by then-Governor of Maryland, Larry Hogan, on January 13, 2023.

11.     On July 5, 2023, the State of Maryland awarded John $2.9 million under the Walter Lomax Act for the years he spent wrongfully imprisoned. In conjunction, Maryland Governor, Wes Moore, declared that John was "erroneously convicted" by State's Attorney Joseph Cassilly, whom "the Maryland Supreme Court took the rare but necessary step to disbar … for prosecutorial misconduct in withholding exculpatory evidence that would have proven Mr. Huffington's innocence." John's presence at the hearing "serve[d] as a reminder that [the] State [of Maryland] hasn't always gotten it right[,]" said the Governor. "And on behalf of the entire State of Maryland, we are deeply, deeply sorry, and we are deeply, deeply inspired by the work that you are doing now."

12.     Now 62 years old, John Huffington has spent his entire adult life fighting to prove his innocence. He brings this civil suit to fully expose the official misconduct that has forced him to do so, to continue to prove emphatically that he is innocent—for himself, for his loved ones, and to the families of Joseph Hudson, Jr., and Diane Becker—and to recover for the life Defendants stole.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 in that claims in this action arise under the United States Constitution.

14.     To the extent that some of Plaintiff's claims arise under Maryland state law, the Court has supplemental subject matter jurisdiction over those claims under 28 U.S.C. § 1367(a).

15.     The Court has personal jurisdiction over Defendants because at least some reside in the State of Maryland and because their conduct described herein occurred exclusively in Maryland.

16.     Venue is proper in this Court because Plaintiff John Huffington's injuries and damage occurred in the District of Maryland, most Defendants reside and conduct business in the District of Maryland, and virtually all the occurrences described herein occurred in the District of Maryland.

## THE PARTIES

17.     Plaintiff John Huffington is a resident of Maryland. He was wrongfully tried, on two occasions, for the murders of Joseph Hudson, Jr., and Diane Becker, in the Circuit Court of Caroline County, Maryland, and the Circuit Court of Frederick County, Maryland, respectively. John was wrongfully convicted and incarcerated for over 32 years until his release in 2013. He remained under the threat of a third prosecution until 2017, when he entered an *Alford* plea maintaining his innocence. He received a full pardon for the murders in 2023.

18.     Defendant David Saneman was a deputy with the Harford County Sheriff's Office whose conduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Saneman resides in Maryland. Plaintiff sues Mr. Saneman in his personal capacity.

19.     Defendant Diana Cassilly, as Personal Representative of the Estate of Joseph Ignatius Cassilly, deceased, is the representative of the decedent Joseph Ignatius Cassilly. Mr. Cassilly was the Harford County State's Attorney who investigated and prosecuted John Huffington for the murders. Mr. Cassilly was the elected State's Attorney from 1983 until his retirement in 2019. He was the chief policymaker for the Harford County State's Attorney's Office ("SAO"). With respect to those policies, he was a Harford County employee, implementing countywide policies specifically affecting the county at the local level. In 2021, the Maryland Bar disbarred Cassilly for his conduct in this case. He died on January 17, 2025. Plaintiff reopened Mr. Cassilly's estate for purposes of this lawsuit. Plaintiff sues Mr. Cassilly in his official and personal capacities.

20.     Defendant Personal Representative To Be Named of the Estate of William Van Horn, deceased, is a pending personal representative of the estate of decedent William Van Horn. An estate was never opened for Mr. Van Horn and, therefore, Plaintiff petitioned to open one for purposes of this lawsuit. Mr. Van Horn was a deputy sheriff with the Harford County Sheriff's Office whose

conduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Van Horn died on October 20, 1991. Plaintiff sues Mr. Van Horn in his personal capacity.

21.    Defendant Bernadette M. Picha, as Personal Representative of the Estate of Wesley J. Picha, deceased, is the representative of the decedent Wesley J. Picha. Mr. Picha was a deputy with the Harford County Sheriff's Office whose conduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment. On information and belief, Mr. Picha died on May 25, 2019. Plaintiff reopened Mr. Picha's estate for purposes of this lawsuit. Plaintiff sues Mr. Picha in his personal capacity.

22.    Defendant Personal Representative To Be Named of the Estate of Gerard Comen, deceased, is a pending personal representative of the estate of decedent Gerard Comen. An estate was never opened for Mr. Comen and, therefore, Plaintiff petitioned to open one for purposes of this lawsuit.  Mr. Comen was an Assistant State's Attorney for Harford County, who investigated and prosecuted John Huffington for the murders. On information and belief, Mr. Comen died on January 16, 2018.

23.    Defendant Harford County is a county within Maryland, which included: (a) the Harford County State's Attorney's Office as the chief prosecuting agency for the county, which at all relevant times, was the employer of Defendants Cassilly and Comen; and (b) the Harford County Sheriff's Office as the chief law enforcement agency for the county, which at all relevant times was the employer of the Defendants Saneman, Van Horn, and Picha. Plaintiff brings only the derivative claim of indemnification against Harford County.

## FACTS APPLICABLE TO ALL COUNTS

### The murders of Joseph Hudson, Jr., and Diane Becker in the early hours of May 25, 1981

24.    In 1981, 30-year-old Joseph Hudson, Jr., and 21-year-old Diane Becker were dating, and lived in a trailer together at the Long Bar Harbor Campground ("Campground") in Abington,

Maryland, with Becker's then four-year-old child. Mr. Hudson was a local disc jockey and drug dealer, and Ms. Becker was similarly involved in drug dealing.

25.    During the morning of May 25, 1981, Mr. Hudson and Ms. Becker were tragically found slain in separate locations.

26.    Mr. Hudson was found shot to death on Wheel Road in Emmorton, Maryland, a relatively secluded rural road dotted with some homes, about three miles from the Campground.

27.    Ms. Becker was found repeatedly stabbed and bludgeoned to death in her bed in the Campground trailer. Her four-year-old, who was sleeping elsewhere in the trailer and woke to find his mother, slept through the murder and was physically unharmed.

28.    The hours leading to the murders were a focus of Harford County investigators.

**The hours leading to the murders on the evening of May 24, 1981**

29.    On the evening of May 24, until the early morning hours of May 25, Hudson had been DJ'ing, and Becker partying, at The Golden 40 club. They were there with their Campground neighbors, Erlene Perez and Michael Perez, celebrating Michael Perez's and Diane Becker's birthdays.

30.    Deno Kanaras and John Huffington were also at Club 40 that night. Deno had driven John there in Deno's 1979 blue Chevy Monte Carlo. Deno was looking for cocaine and knew Hudson might be able to get some. Deno spoke to Hudson and they agreed to return to the Campground after the club closed, where Hudson would sell him cocaine.

31.    At one point during the evening, Diane Becker returned to her Campground trailer and sold cocaine to a man (David Britton) who had followed her home from the club. After the sale, Becker returned to the club.

32.    As the club closed, Deno and John got into Deno's car and followed Hudson, Becker, and the Perezes back to the Campground. On the way, they stopped at a 7-11 where John and Hudson went inside. Then Deno exited his vehicle to speak to Becker, who remained in Hudson's car with the

Perezes. Becker said "Hello, Deno" as he approached, and they spoke. When John and Hudson exited the 7-11, they returned to their cars and drove back to the Campground.

33.     Upon arrival, Becker paid a babysitter (Tina Weidner) watching her child and the babysitter left. The Perezes made plans to meet with Hudson and Becker for a BBQ the next day and went back to their trailer for the night. Deno and John then went into Hudson and Becker's trailer so that Deno could buy cocaine from Hudson, which he did.

34.     Thereafter, Deno drove John home to the Greenbriar Apartments in Bel Air, Maryland. John got home between 3:00 and 3:30 a.m. John soon received a call from a friend named Tom Hall, who asked John if he wanted to come to a house party, but John declined. Deno left John's apartment, and John went to bed.

**The events of May 25, 1981**

35.     The following morning, John was awoken by Deno who had returned to John's apartment. Deno looked wired, as if he had not slept all night. Deno asked John to accompany him to the Fiddler's Convention, an outdoor festival in Cecil County, Maryland. John agreed.

36.     Deno and John drove to the Fiddler's Convention but were only there a short time. While there, Deno fixated on obtaining a wristband for proof of attendance at the festival. He offered money to a festivalgoer to obtain one and did.

37.     Around that time, Deno told John that if anyone asked, John should say that he was with Deno at the Fiddler's Convention all weekend. John agreed. John, who was then 18 years old, did not think much of Deno's request.

38.     After leaving, Deno and John briefly stopped by Tom Hall's house. Mr. Hall's family owned a furniture store in Aberdeen, Maryland, called Hall's Furniture, and Tom had to get to work to open the store. Thereafter, Deno drove John to John's parents' home, which was just down the

street. John went inside while Deno stayed outside in his car. John's father was outside gardening and Deno exchanged brief pleasantries with him and sat in the car waiting for John to return.

39.    When John returned, Deno drove him to Hall's Furniture to meet Tom.  Deno parked in front of the store. John exited Deno's car and walked directly into the store through its front door. After that, John did not see Deno again outside of a courtroom.

40.    Tom had to work for several hours more. John hung around for a time and then borrowed Tom's car. John ran errands and went to the Pimlico Racetrack. Thereafter he returned Tom's car to the furniture store and Tom drove John to the apartment of Kim Bognanni, John's then-girlfriend. While there, a friend of John's named Tommy Kanaras (Deno's cousin) stopped by and informed John that the Harford County Sheriff's Department wished to speak with him.

***The Sheriff's Department learns about Hudson's and Becker's drug debts as well as Becker's work as an informant and are told that they were murdered for it***

41.    On May 25, 1981, at approximately 10:15 a.m., investigators reported to the Campground and were led by Michael Perez to the body of Diane Becker in the trailer. Ms. Becker was lying on the bed. It was immediately apparent that she was deceased. An autopsy would reveal that she had a blunt force injury to her head resulting in a laceration and such force that it caused a hinge fracture to the base of her skull. Her throat had also been cut, and she had been stabbed repeatedly. Investigators witnessed extensive blood on the bed, walls, floor, exterior wall of the trailer, and the ground outside where blood had seeped through the trailer. However, several items that appeared to have fallen from cabinets surrounding the bed did not have blood spatter on them, which suggested that the murderer had ransacked those cabinets after the murder.

42.    Police quickly interviewed Michael and Earlene Perez. Mr. Perez informed police that the evening before two men followed him, his wife, Hudson, and Becker home from The Golden 40 and that he heard Diane Becker call one of them "Deno."

43.    At approximately 1:35 p.m., Defendants David Saneman and William Van Horn went to The Golden 40 nightclub and, while there, received a call that another body had been found off Wheel Road near Emmorton, Maryland.

44.    Saneman and Van Horn went to the scene at Wheel Road, where they identified Hudson as the decedent. Mr. Hudson was lying face down and had gunshot wounds to the right side of his head, the top of his skull, and his back. Two spent rounds were lying near the body, within roughly three to five feet. The rounds were determined to be .38 caliber. It appeared that the subject had grabbed foliage near the road before he died.

45.    Hudson's best friend, Ernest Bohanan, had come to the Campground and briefly spoke with investigators. Bohanan left without providing much information, but phoned police later, around 6:30 p.m., to tell Defendant Wesley Picha that he could not talk down at the Campground because of all the people nearby, but that he knew who killed Joe Hudson. Hudson had told Bohanan that he was in serious debt to his drug suppliers, namely a man named "Phillip" who had paid a visit to Hudson's trailer two weeks earlier and threatened him. Hudson had told Bohanan that Phillip and his associates would "kill him if he didn't pay up." Hudson had not paid-up. Additional witnesses would tell police that Hudson and Becker were terrified for that reason and others.

46.    Indeed, Diane Becker's friend, Debra Mitchell, would provide similar information to police. Mitchell relayed that Becker told her that Joe Hudson owed Phillip $4,000 for cocaine, but that they were not using their cash on hand to repay him. Phillip called repeatedly for the money, prompting Hudson and Becker to disconnect their phone in the weeks just before the murder. They had not reconnected the phone at the time of the murder.

47.    Further, Becker was acting as a drug informant for police. As known to Defendants, Becker was working for Gary Aschenbach, an undercover Maryland State Trooper. Two weeks before Becker's murder, police raided several suspected cocaine dens. On information and belief, Becker

informed on a popular pizza parlor in Churchville, Maryland, which was raided by police. Becker and Hudson were so concerned for their safety around this time that they stayed at Becker's parents' home and their apprehension and fear were apparent to all there.

48.    Defendants never disclosed the statements of Ernest Bohanan and Debra Mitchell to John Huffington nor any of the information provided regarding alternative suspects for the murders.

49.    Defendants never disclosed the information relating to Phillip or Becker's informant status to John either. It is still unknown whether investigators ever followed these leads.

***Police identify Deno Kanaras as a person of interest, alert his family, and provide him time to alter and destroy evidence in front of officers***

50.    After speaking with Michael Perez, police quickly identified the person of interest, "Deno," as Deno Kanaras.

51.    Deno came from a family well known in the local business community as the owner of the Red Fox Lounge and the Fox's Den, restaurants in Bel Air. The Red Fox Lounge was situated right next door to the Harford County Sheriff's Office and was frequented by law enforcement. Deno worked at the Fox's Den for a time before his family terminated his employment for stealing.

52.    Harford County investigators permitted Deno extraordinary latitude and paid him and his family an unusual degree of deference throughout the investigation.

53.    Investigators first called Deno's father, John Kanaras, the owner of Red Fox Lounge and the Fox's Den, to notify him that they needed to speak to Deno in relation to the murders. Mr. Kanaras informed them that Deno was living with him and his wife in Perry Hall, Maryland. Mr. Kanaras immediately called Deno at home and notified him. However, rather than immediately question Deno, investigators waited hours before approaching him, allowing his father to notify him and permitting Deno to tamper with evidence of the crime right before investigators' eyes.

54.    Specifically, investigators Saneman and Van Horn went to Deno's parents' home and identified Deno's Monte Carlo outside the home. The car matched descriptions they had received of

11

the vehicle parked outside Hudson and Becker's trailer the night before. Nonetheless, Saneman and Van Horn left and went back to the Sheriff's Office for several hours. Their time is unaccounted for in investigative records in John Huffington's possession.

55.     About 10:45 p.m., Saneman and Van Horn finally returned to Deno's home. While driving, they passed Deno driving his Monte Carlo on the road. Deno returned home a short time later and the deputies approached his garage and Deno let them in. The deputies interviewed him about 11:00 p.m. that night at the Kanaras's kitchen table while Deno drank a cup of tea.

56.     The deputies either did not ask, or did not document, where Deno had been with his Monte Carlo in the intervening hours. Moreover, when they asked for his whereabouts the night before, Deno lied, telling them the story he had asked John to tell: that he had gone straight from the Golden 40 to the Fiddler's Convention.

57.     However, when Saneman and Van Horn informed him that they knew he was lying, Deno quickly stated that he and "John" had stopped at the Campground only to get a "couple of joints" from Hudson and Becker before driving to the Fiddler's Convention.

58.     The deputies obtained a consent search of Deno's car. They determined that the floor mats were wet, the windows were recently wiped, and that the inside of the vehicle had very recently been cleaned. Investigators took the floor mats for testing, but either did not ask, or did not document, why they were cleaned. Further, Saneman and Van Horn did not seek a search warrant for the Kanaras' home. Incredibly, they would never seek a search warrant for the Kanaras's home.

59.     Deno told investigators that he did not know "John's" last name, but that his cousin, Tommy Kanaras, would. When investigators called Tommy Kanaras, he told them "John" was John Huffington. This was just before Tommy Kanaras drove to Kim Bognanni's house to inform John that the Sheriff's Department wanted to speak with him.

60.     Deno was not arrested and investigators left.

12

**John drives to the Sheriff's Office to talk to investigators**

61.    John went directly to the Sheriff's Office without an attorney. He arrived at about 12:30 a.m. on May 26, 1981. Defendants Saneman and Van Horn interviewed him.

62.    John reported that he had gone to the trailer with Deno and then told investigators what Deno had asked him to: that Deno and he went straight to the Fiddler's Convention from there. John consented to a search of his apartment. John also offered to participate in a polygraph examination, but investigators declined.

**The coroner examines Hudson's and Becker's bodies**

63.    At about 8:30 a.m. on May 26, 1981, Diane Becker's body was examined at the morgue. The medical examiner determined that she appeared to have been stabbed "with some type of hunting knife with a thick blade" and that her head "was severely depressed and that it was made with some type of blunt object possibly a sharp edge or corner." In total, she had dozens of deep stab wounds, had been violently beaten, and her throat slit. Ms. Becker's fingerprints were taken.

64.    At 9:52 a.m., on May 26, 1981, Joseph Hudson's body was examined. Hudson was shot five times, including in the left temple, in the head above the right ear, the lower left chin area exiting through the rear neck just below the hair line, the rear middle back area, and inside the left elbow. The medical examiner removed two spent bullet rounds and gave them to an investigator who took them as evidence. Mr. Hudson's fingerprints were also taken.

**Investigators concoct a new, detailed story using Deno to implicate John**

65.    At 11:22 a.m., on May 26, 1981, Deno and his father came to the Harford County SAO with two attorneys.

66.    Saneman and Van Horn and Defendant/Assistant State's Attorney Jerry Comen concocted a new statement relating to the murders through Deno. On information and belief,

Defendant Cassilly was also present and involved in concocting the statements and/or, at a minimum, was aware that his partner, Comen, was preparing Deno's statement to falsely implicate John.

67.    Pressures in Harford County to secure convictions were increasing, largely due to a string of losses in high-profile cases, so Cassilly started to take on investigative responsibilities in high-profile cases, such as this one. For example, in the late 1970s, from the outset of one large investigation, Cassilly had been "in charge … aided by Sheriff's deputies, State Police, and at least two members of Maryland Attorney General Stephen H. Sachs' staff."[1] When he ran against his boss for State's Attorney of Harford County, his main line of attack was his boss' distance from police investigative work and lack of support to police.[2] Indeed, "under Cassilly's direction, the state's attorney's office…worked more closely with law enforcement officials in investigating crimes to help 'avoid legal traps out there.'"[3]

68.    Around this time, Cassilly headed an investigative drug task force comprised of the Harford County Sheriff's Office, State Police Bel Air barrack, and local police departments in Harford County, that years later led to a number of indictments.[4]

69.    Deno's new statement was an incredible story that painted the 25-year-old as under duress from the 18-year-old John Huffington. Deno claimed that John hatched a plan to steal money from Hudson and Becker's trailer and murder them, and that Deno merely did what John demanded. Deno claimed that after leaving the trailer the first time, they returned and John lured Hudson to Deno's car by claiming he had a buyer for Hudson's drugs. Deno claimed that at about 4:00 a.m., he drove with Hudson in the front seat and John in the back, with John directing them to a spot on Wheel Road. Deno claimed that he did not know where John was taking them or who they were going

---

[1] *The Aegis*, "Harford County: Cobb Has His Future at Stake with Indictments," 10/18/1979
[2] *The Aegis*, "Harford County: Cobb Backs Threat – Fires Assistant Cassilly," 7/8/1984
[3] *The Evening Sun,* "Harford's prosecutor: Handicap no barrier for Cassilly," 6/5/1985.
[4] *The Aegis*, "37 local drug dealers indicted in police crackdown," 6/7/1984.

to meet. When they arrived, Deno claimed that he and Hudson walked ahead while John was four or five steps behind them and that John just began shooting, reloaded "real fast," and then shot Hudson in the head. In turn, he claimed that John told him to drive him back to the trailer because Deno "heard [Hudson] talking about having several thousand dollars cash in his trailer."

70.    According to the investigators' report, Deno further stated that, a little after 5:00 a.m., when they were in the trailer and Becker and her child remained sleeping, John ordered Deno to search for cash, and Deno found about $2,300 there. Deno claimed then that John instructed him to kill the sleeping Becker, but Deno refused. According to Deno, that is when John grabbed "a big whiskey bottle" next to Becker's bed, started beating Becker's head with it, before he then took a knife out of his pocket and started stabbing Becker. Deno claimed that he left the trailer, and that John followed him out and demanded that Deno drive him home.

71.    In the car, Deno claimed John threatened him and so he drove him back to John's apartment, where John counted the money, changed his clothes, and washed up. According to Deno, John then told him to drive him to "Pennsylvania, I mean well Conowingo [Dam]." Deno claimed that he obliged out of fear and that John "burned a letter and threw the gun and a knife into a stream," and then told Deno to drive him to the Fiddler's Convention. After that, John told him to drive him to Hall's Furniture where Deno dropped him off and Deno went straight home.

72.    Saneman, Van Horn, and Comen concluded that Deno was present for the murders and would be charged. They went to work on him to fabricate additional details of the already-fabricated story. According to the report of this interview, on questioning, Deno provided additional details:

    a.    He claimed there was no blood on him but that there was blood on John. He continued, "Oh that's right. I forgot to say that at Hall's Furniture that's where [John] threw a pair of pants away that had blood on them in the dumpster back there where I dropped him off." Later, he clarified that the pants were in a brown paper bag when put into the dumpster.

b.  He claimed that John said he killed Becker because "she had left a note [in the trailer] but Joe left the note saying where he went and who he left with." Deno claimed that John later burned the note.

c.  He claimed that the weapon "looked like" a ".38" caliber revolver.

d.  He claimed that Huffington "insisted" that Deno take $800 of the stolen money.

e.  He claimed that John had tried to "bleach" a bloody shirt. Shortly thereafter, when investigators asked if John took the shirt with him (like the pants, as Deno had stated), Deno changed his story and agreed with investigators that John left the shirt at his apartment because "[i]t didn't look like it had any blood on it because it was white."

f.  Deno changed his story from John having pulled a knife from his pants to saying that John had pulled the knife from his boot. He described the knife as having "about a 4" blade on it and a little leather strap with it and I think it had a black and white handle."

g.  He described John as wearing a jacket under which he carried his gun, but that "right before he shot Joey he took [the jacket] off[.]" A few minutes later, when asked to describe the Hudson shooting again, Deno changed his story again and claimed that after John had shot five times, he "stopped and pulled a couple of bullets *out of his jacket* and put them in the gun…."

73.     Investigators, including Saneman, Van Horn, and Comen, prepared these knowingly false statements with Deno. On information and belief, Cassilly participated in and/or was aware of investigators' knowing preparation of false statements. The interview concluded at 12:15 p.m.

74.     Deno believed that he could avoid jail if he worked with investigators to implicate John. Indeed, at the end of the interview, Deno explained that he was talking because he "never want[ed] to go to jail." Ultimately, Deno would receive leniency: Prosecutors would not seek the death penalty against him. Further, Cassilly would write a favorable letter to the parole board and testify live at a parole board hearing for Deno, which resulted in Deno's parole and release from prison in 2008, years before John ever obtained his release.

75.     After the interview, investigators let Deno leave again with a plan to meet later that day, when Deno would show them where evidence of the crime had allegedly been deposited.

*Deno takes investigators to the alleged evidence and John is arrested*

76.     At about 1:00 p.m., Saneman and Van Horn met Deno and his attorney at a Hardees Restaurant located on Route 22, in the Campus Hills Shopping Center. Thereafter, Deno and his attorney took investigators to what Deno said was discarded evidence of the murders.

77.     First, they proceeded to Hall's Furniture. In the rear dumpster, about 1:35 p.m., Defendant Van Horn found "a pair of pants in a brown paper bag." In a property form, they were described as "off white corduroy pants."

78.     Van Horn left Hall's Furniture to return to the Sheriff's Office to meet John and his attorney, at which point John was arrested for the murders.

79.     Shortly after John's arrest, investigators performed a gunshot residue test on him. John would never receive the results, nor was it ever used in any fashion of which he is aware.

80.     Around the same time, Saneman accompanied Deno and his attorney from Hall's Furniture to Harmony Church Road, a dirt road which paralleled a stream. Deno informed Saneman that "he recalled pulling off onto the lefthand shoulder of the road at a pulloff area next to the stream." Deno had not mentioned Harmony Church Road in his prior statements to police. Nonetheless, it was here that Deno claimed that "Huffington took the purse belonging to Diane Becker along with a note that was found in the trailer and he burned these items on the bank of the stream and then poured dirt over the top of them to cover the ashes." He further advised that John threw *a box* of .38 ammunition into the middle of the stream and also removed several live rounds from his pants pocket that were loose and threw them into the edge of the stream. Deno said that John "threw the whiskey bottle, which he had struck Diane over the head with, into the wooded area on the opposite side of the road." Strangely, however, investigators and Deno found none of that evidence there. Deno suggested that they proceed north toward Conowingo Dam to locate the gun and knife.

81.    Deno guided Saneman across the dam and instructed them to make a right-hand turn immediately on the opposite side of the dam, to head south toward Port Deposit on Route 222. According to reports, Deno located "a revolver in a holster and a hunting knife in a sheath lying in the water approx. twelve to fourteen inches from the edge of the bank." Defendant Saneman obtained them and placed them into the trunk of his vehicle at approximately 2:48 p.m. Property forms indicated that the revolver had five live rounds—it was fully loaded. The knife was described as a "10[-inch] sheath knife, with black and white plastic grip" in a "brown vinyl knife sheath."

82.    Saneman asked Deno if he knew where John had obtained the gun, but Deno said that he did not know. However, upon prodding from his attorney, Deno then admitted that he (Deno) had bought the gun "about a month ago…. had the gun for about a week and he fired a couple bullets from the weapon and had then approx. week prior to the incident given the gun to Huffington in exchange for some cocaine." Deno's story about when he sold the gun to John would change numerous times in the coming months and years. The truth is that he never sold the gun to John.

83.    About 3:10 p.m., Saneman returned to Harmony Church Road with Deno and his attorney. About 4:00 p.m., after nearly another hour of searching, they were "finally able to locate the area where the purse was burned along the bank on Harmony Church Road." In turn, "Deno … pointed out the live rounds of .38 ammunition which were located on the edge of the bank and partially in the waters (sic) edge." There were six live rounds. No box of .38 caliber ammunition was found.

84.    Then, about ten minutes later at 4:10 p.m., on the opposite side of the road, Saneman and Deno identified a clear, one-gallon, Smirnoff-branded vodka bottle — not a whiskey bottle — "lying in the wooded area approx. ten feet from the edge of the road." Despite John having allegedly wiped down the evidence, "[t]he bottle contained what appeared to be extensive blood stains on the bottom area and label area of the bottle." Defendant Picha initialed the bottle on the cap, photographed these items, and took them into custody. He did not, however, take the revolver and

knife with him, which Saneman kept in the trunk of his car. A "torn note" was also recovered, according to the report.

85.     Deno told Saneman that he had touched the bottle "when he had removed it from the trunk of [his] vehicle and placed it onto the roadway at which time John Huffington picked the bottle up and threw it into the woods. Deno advised that he picked the bottle up only by lifting "from the top cap area of the bottle with his fingertips and placed it onto the roadway and that his fingerprints would not be located anywhere else on the bottle." Like many key details of his statements, Deno would later tell a very different story about when and where he touched the bottle. Thereafter, Saneman dropped Deno and his attorney back off at the Hardees Restaurant in the Campus Hills Shopping Plaza.

86.     At about 6:30 p.m., Deno was charged with the murders of Hudson and Becker and was released on a $200,000 bond.

**Investigators continue to fabricate evidence using Deno and permit the Kanaras family extraordinary latitude in dictating the alleged evidence of the crimes**

87.     Shortly after Deno and his attorney were dropped off at the Campus Hills Plaza, investigators received a call from a woman named Susan Spicer, who, while looking near the area where Hudson's body was located, found a partially deformed lead bullet that investigators had overlooked. Authorities obtained the bullet sometime after 8:00 p.m.

88.     About 1:00 a.m., on May 27, 1981, Van Horn and Saneman applied for a search warrant for John's apartment, stating that they believed the residence concealed certain property relevant to the murders, namely, "1 white short sleeve knit shirt, blue nylon jacket, assorted jewelry, fifteen hundred dollars in U.S. currency, 1 cotton white rag, 3[.5] grams cocaine, 1 bottle of [C]lorox bleach." The search warrant was immediately granted, and a search commenced about 1:30 a.m.

89.     Further on May 27, James William Baroch, who lived on Wheel Road near where Hudson's body had been found, called the Sheriff's Department to report that he lived in a place

formerly inhabited by a man named Dale Saunders. Mr. Baroch reported that he had personally seen Deno visit Dale Saunders at that location "on several occasions, maybe 12 times" in his Monte Carlo. Deno had told investigators he did not know where John was leading him and Hudson as they drove to Wheel Road.

90.    At about 2:00 p.m., Van Horn and Saneman took another statement from Deno. After repeating that both he and John had returned to the trailer a little after 4:00 a.m., Van Horn and Saneman encouraged Deno to provide additional false details to improve his story, including:

    a.  John told Hudson that John had a buyer for cocaine who would pay a price higher than John had paid for it earlier that night and that they were to go meet this buyer.

    b.  "Hudson wrote a note before we left in ink and sat it on the counter…."

    c.  After John murdered Hudson and "[w]hile driving to the Campground, John … told me that … Hudson had spoken to him about having about two thousand dollars in the Motor Home to buy a larger amount of coke."

    d.  While inside Becker's trailer after the Hudson murder, "I then opened the cabinet which was opposite the sink and the money was in two glasses which was in front. I told John Huffington that I found the money, and he then took the money out of the glasses and put it in his left and right pockets."

    e.  John "then took the note off the counter behind him and turned to me and told me to kill the girl. He pulled a 4" steel blade knife that was inside a leather case out of his boot and told me to kill the girl, Diane. He told me to stab her…."

    f.  "He then took a whiskey bottle that was very large and laying on the floor and started hitting Diane in the back of the head with the bottle. He hit her about five or six times and she woke and was screaming while she was being hit. He then took the knife and she was still alive. He stabbed her several times right in the chest and she still didn't die. She was just shaking on the bed. Then he took the knife and started sticking it into her throat. As he did this, I went to the back of the mini motor home and proceeded to run to the car. John followed me about fifteen or twenty feet behind me through the door."

    g.  "He got into the car right after me. … This time he had the bottle in one hand and the gun in the other hand and I guess that he put the knife inside his boot. He then told me to drive back to the Greenbriar Hill apartments."

    h.  "We got to the apartment and he walked me back to the bedroom with him. He then started to take his clothes off and he started wiping off the knife and gun and bottle with some rags in the bedroom right on the bed. He sat everything on the bed. He then started counting the money and I told him that I didn't want anything to do with the

money. I just wanted to go home. He told me that I had better take the money or else or something like that."

i.  "He took his pants which was white in color and put them into the sink. He then poured bleach over … them. He tried to wash the bloodstains out. He then put everything but the pants into a bag, the pocketbook, a little case. He put the white pair of pants into another bag. He put the whiskey bottle into the first bag. He then told me that he wanted me to drive him … to the Fiddler's Convention."

j.  He gave a detailed story regarding how each piece of evidence was disposed of at both Harmony Church Road and just past the Conowingo Dam.

k.  He claimed that Huffington started telling him about another "guy by the name of Nick was going to get access to a large amount of money and he was talking about killing him. He was going to shoot him too."

l.  Regarding their half hour stay at the Fiddler's Convention, Deno said he ran into an old friend, spoke to him, left and Huffington "told me that he would let me go if I took him to Aberdeen. He had been threatening me the entire time since he shot Hudson. I felt threatened the entire time I was with him. He told me that he was going to get me if I didn't do what he told me to do."

m.  "We drove to Aberdeen and drove to Hall's Store. We drove to the back of the store, he got out of the car and he grabbed a bag that was at his feet and took it out and walked over to the dumpster and threw the bag in the dumpster. I then left at the time alone."

n.  "After that, well about 6:00 p.m. after I found out the Sheriff Department wanted to talk to me, I cleaned out my car. I wiped down the seats with a wet rag, and vacuumed the interior. …."

91.  Van Horn and Saneman then prompted Deno to identify the "cocaine [taken from Hudson's body] was in a plastic container and John placed it in a Marlboro cigarette pack and placed it in his pocket." In turn, the investigators had Kanaras identify a Marlboro cigarette pack taken from Huffington's apartment as "look[ing] like the box that John had put the cocaine in." This was false and both investigators and Deno knew it.

92.  Deno admitted having been to the house on Wheel Road several times before.

93.  Deno claimed that he did not know that John had a gun or knife on him that night.

94.  On additional questioning regarding Becker's reaction to being attacked, Deno claimed that "I guess she tried to raise up some but John kept hitting her" and "[s]he just kept screaming[.]"

Subsequently, a handwritten addition to the interview says, "but not loud" after the word "screaming." Investigators continued to manipulate Deno's statements, manufacture details, and create a false story.

95.     Regarding John allegedly taking Becker's purse from the trailer, investigators asked Deno how John could carry the purse while also carrying the gun, knife, bottle, note, and wads of cash (not to mention while making it back to Deno's car after murdering Becker allegedly at the same time Deno left for the car).  Deno said he didn't know.

96.     Upon further prodding, Deno claimed John told him what the note in the trailer said: "that Joe had gone out with John and Deno and would be back soon. I didn't actually see the note."

97.     At the very end of the interview, Deno offered that it was "possible" John had murdered them on a "contract" because John "said that he had shot people before."

98.     On May 27, at 5:10 p.m., Saneman turned the knife, sheath, gun, and holster over to Picha. Saneman had these alleged murder weapons since he recovered them the prior afternoon and put them into the trunk of his vehicle.

99.     Investigators' odd deference to Deno continued. At 5:21 p.m., on May 27, Picha responded to Deno's attorney's law office. There, the attorney turned over some of the clothing that he and Deno claimed that Deno wore during the murders, including a blue shirt, black pants, yellow/orange Hanes underwear, and socks (white with blue and yellow stripes). They noted that the clothes "had been washed using no bleach but warm water. [The attorney] also stated Ms. Kanaras advised that she had used Tide detergent to wash the clothes." Investigators did not ask when they were washed (or did not document it), despite the fact that they had alerted Mr. Kanaras to the investigation prior to 6:00 p.m. on May 25, and they never sought a search warrant of the home.

100.    Nearly two hours later, at 7:08 p.m., Picha went to the Kanaras residence in Perry Hall, at the request of Deno's attorney, to pick up a jacket and shoes Deno claimed he had been wearing

during the murders. Deno's father handed Picha "a shopping bag which contained one black leather jacket and one pair of brown boots."

101.    Thereafter, Picha went to the Baltimore County Police Department, Fullerton Station, and advised an officer "of the situation of the Kanaras' (sic) possibly being in danger. [The officer] stated he would advise cars in the area to patrol the residence."

**Investigators receive additional evidence of Deno's motive and plan to rob and murder Hudson and Becker**

102.    Investigators received abundant information that Deno had a drug abuse problem and was in serious debt — so much so that a man came into the Fox's Den demanding money from Deno just two weeks before the murders. Moreover, Deno had stolen from the Fox's Den – a family business, had left the Fox's Den about a week prior to the murders, and had not returned to work.

103.    On June 11, 1981, Van Horn and Saneman took the statement of Stephen Rassa. Mr. Rassa previously lived with Deno and was his "best friend." Rassa told police that just a week prior to the murders, he and Deno had used a lot of "crank." Deno had a terrible drug problem, was in serious debt, and needed money so badly he was trying to hock jewelry. Rassa said that Deno told him that he wanted to rob and kill Hudson. Rassa said that Deno repeated this multiple times, told him he had a gun and a knife, and they even visited Hudson's trailer where Deno bought cocaine from Hudson. Rassa described the very same five-shot, imported revolver in Deno's possession – consistent with the gun to which Deno had led investigators. Rassa said he was frightened by Deno and extremely frightened that Deno planned to rob Hudson then, so he hurried Deno out of the trailer.

104.    Mr. Rassa told Van Horn and Saneman that as soon as he saw the news story about Hudson's and Becker's murders, he worried it was Deno and told his mother the same. Rassa said that he stayed at a friend's house (Alvaro Paul Vela) because he feared Deno, particularly because Rassa was aware of Deno's plans with respect to Hudson. Rassa also told Van Horn and Saneman that Deno and John Huffington were not close, and he was surprised that they would be implicated together.

105.     On June 16, 1981, Alvaro Paul Vela, the man with whom Rassa had stayed after the murders, confirmed to Van Horn and Saneman that Rassa had told him about Deno's plan to rob and kill Hudson. Further, Mr. Vela told them that Rassa had said that about three weeks prior to the murder Deno told Rassa that he wanted to "rob[] a huckster by throwing him in the back of his truck or hitting him over the head and locking him in the back of his truck and taking his money." Vela said that Rassa said that he had to "talk[] him out of it and told him that it was not the smart thing to do." Further, Vela confirmed that Rassa told him that Deno carried the "five-shot revolver, imported, under the driver's seat in the car. Steve said he carried it with him all the time."

106.     Maryland State Trooper Gary Aschenbach would later testify that he worked undercover narcotics, had regular contact with Deno, and that Deno was both desperate for money and willing to participate in crimes to fund his drug habit. Kanaras enthusiastically volunteered to blow-up a boat in exchange for money — a fake plan Aschenbach invented for his investigation.

**John and Deno are indicted after Deno testifies falsely before the grand jury**

107.     On June 16, 1981, Deno testified before the grand jury to aid prosecutors in indicting John. Deno's false narrative changed in several key respects. Such falsity would have been obvious to the investigators and prosecutors who worked with Deno in developing his false statements. The grand jury returned an indictment against John for the murders and related offenses the same day.

108.     On July 28, 1981, a grand jury indicted Deno for the same offenses.

109.     On August 31, 1981, Rassa spoke to Van Horn and Saneman again, repeating that Deno told him that he wanted to rob and kill Hudson. Furthermore, Rassa said that Deno previously told him that he wanted to commit the "perfect crime" and felt that he could beat police by acting — he considered himself an actor and would impersonate actors like Al Pacino. He further advised that Deno told Rassa as he stopped by Hudson's trailer and reached for his gun, "if you kill Diane, I'll take

24

care of Joe and we'll split the coke and the money or words to that effect." Finally, Rassa said he believed Deno purchased the revolver from Joe Ramona, a horse owner who gambled at the racetrack.

110.     On October 12, 1981, Saneman and Comen interviewed Becker's babysitter, Tina Weidner, again. According to their report, the 16-year-old told them "that she observed a whiskey bottle in the motor home on the night of the homicide while she was babysitting with [four-year-old] Danny Becker. She stated that the whiskey bottle was sitting on the floor of the camper and was half full of pennies and it had a full bottle cap on top." Furthermore, she advised that "Diane Becker told her that Joe was dealing with a guy who the police had hit with a search warrant the week prior and that things were hot and that he wanted to sell drugs that they had and then get out of the business." When shown the Smirnoff vodka bottle found at Harmony Church Road, however, on October 14, 1981, Ms. Weidner could only say that "she was pretty sure that the bottle was the same as the one that was in the Hudson camper….[and] that if [it was then it] was half full of pennies[.]"

111.     On October 16, 1981, Saneman and Van Horn spoke to Tom Wagner again, who identified the revolver as the gun Deno tried to sell him not long before the murders.

**John and Deno are tried for the murders separately and convicted**

112.     Venue for John's trial was transferred to the Circuit Court of Caroline County. Trial took place from November 3 to November 13, 1981. Comen and Cassilly tried the case.

113.     Comen and Cassilly took the unusual step of refusing to call Deno as a witness due to his lack of credibility. Instead, they requested that he be called as a "court's witness" and requested that the court question him. The court agreed to call Deno but required Cassilly and Comen to question Kanaras. Based on Deno's false testimony, John was convicted of two counts of felony murder and sentenced to death.

114.     From March 22 to April 1, 1982, Deno was tried and convicted of the murder of Becker, but not Hudson, and sentenced to life. Cassilly and Comen did not seek the death penalty.

115.    John appealed his convictions, and, on December 6, 1982, the appellate court reversed, and the case was remanded for a new trial. *Huffington v. State*, 295 Md. 1, 452 A.2d 1211 (1982).

116.    On remand, venue for John's trial was changed to Frederick County. From November 8 to November 19, 1983, he was retried. By this time, Cassilly was State's Attorney of Harford County. He tried the case again alongside Comen.

117.    The case was again tried largely on Deno's testimony. The State also presented the testimony of FBI Agent Michael Malone that hair samples recovered from Becker's trailer "microscopically matched the head hairs of Mr. Huffington — that is, they were indistinguishable from Mr. Huffington's head hairs; you could not tell them apart." This evidence would later fall apart.

118.    John was again convicted of two counts of felony murder and sentenced to death.

119.    On November 13, 1985, the appellate court affirmed John's judgments of conviction. *Huffington v. State*, 304 Md. 559, 596, 500 A.2d 272, 290 (1985).

***John spent the intervening decades pursuing post-conviction relief and forensic testing to prove his innocence, only to be thwarted by the brazen misconduct of Defendant Cassilly***

120.    John filed a series of postconviction motions challenging his convictions. On January 8, 1991, the circuit court granted, in part, a petition for postconviction relief and ordered a new sentencing hearing.

121.    In December 1991, the State received blood testing results of the jacket John was wearing on the night of the murders — which Deno claimed had blood on it. Testing demonstrated that there was no blood on the jacket. Nonetheless, Cassilly and Comen withheld the results.

122.    On April 28, 1992, the circuit court resentenced John to life imprisonment.

123.    Additional appeals and post-conviction proceedings followed. On May 19, 1997, John requested all documents related to his investigation and prosecution. On May 28, 1997, the State replied that much of the information was provided in discovery during the trials and denied the remainder of the requests, still without disclosing the results of the jacket testing.

124.    John filed a second postconviction petition, which was denied, and an application for leave to appeal the denial, which was also denied. In addition, John unsuccessfully petitioned in federal court for a writ of habeas corpus. *Huffington v. Nuth*, 140 F.3d 572, 585 (4th Cir. 1998).

**For years, Cassilly withheld evidence demonstrating that Agent Malone's testimony was false**

125.    On June 18, 1997, the U.S. Department of Justice ("DOJ") wrote to Cassilly to inform him of an investigation into FBI Agent Malone in light of Malone's role in John's case.

126.    On July 18, 1997, an internal DOJ Memorandum noted that Cassilly initially asked that, in light of the June 18 letter, the Huffington evidence be retested, but later decided to hold-off to see if the defense filed any more post-conviction motions in John's case.

127.    On October 13, 1999, an FBI investigator examined Malone's testing and results in John's case and determined that there were problems with the methods, analysis, and testimony.

128.    On October 21, 1999, a senior DOJ attorney sent a letter to Cassilly, informing him that Malone had testified falsely in John's case.

129.    Cassilly did not produce any of the above to John or his attorneys.

130.    Years passed. In 2003, John petitioned the court for DNA testing of evidence used to obtain his conviction. Meanwhile Cassilly moved to destroy the hair evidence and other physical evidence in the case. Cassilly later attempted to defend this request at an April 10, 2013, hearing by falsely claiming that he had only sought destruction of "blood stained sheets, blood stained pants, clothing," but when confronted, admitted that "the hairs would have been part of [his request for destruction]." Fortunately, Cassilly was not successful in his request to destroy evidence.

131.    More years passed. In November 2010, John filed a petition for a writ of actual innocence, based on evidence related to Malone's false testimony. This was based on the 1997 letter—not the 1999 letter of which John remained unaware—as well as the emergence of science discrediting numerous forensic analyses conducted in the case, including the microscopic hair analysis. In response,

Cassilly asserted that "[n]o evidence has been presented that the conclusion that examiner Malone rendered in court is not correct" — with no mention of the 1999 letter. Cassilly intentionally lied again.

132.    On January 20, 2011, John renewed his previous request, seeking the results of investigations or examinations conducted on his body or any of his clothing and/or belongings. The State responded on January 31, 2011, stating "[s]ince the second trial, the State has not conducted any tests…[and is] not aware of any findings made with respect to the windbreaker; nor any tests." This was another false statement by Cassilly since the State had the results of the jacket testing since the early 1990s and had not provided them to John.

133.    On March 30, 2011, oral argument on John's petition occurred. Cassilly mentioned the June 18, 1997, letter from DOJ but falsely stated that in it, he was informed that Malone's testing had been reviewed and "they concluded that his testimony in this case was *appropriate*, that he did not overstate the case." Yet another flagrant lie. The court ordered the State to determine whether the hair evidence from John's trials could be tested for DNA identification.

134.    In April 2011, the State requested that the FBI perform DNA testing on the hairs. On April 5, 2011, Cassilly stated that he was unable to locate a copy of the 1999 DOJ letter.

135.    On November 1, 2011, with testing still not completed and Cassilly claiming he could not find the 1999 DOJ letter, a reporter contacted John's attorneys and informed them of the existence of an FBI report identifying issues with Malone's testimony in John's case. The reporter gave John's attorneys the 1999 letter Cassilly had received from DOJ.

136.    On November 10, 2011, John filed a supplemental petition bringing the evidence uncovered by the reporter to the court's attention and seeking a hearing.

137.    On April 2, 2013, the State transmitted to John the results of the FBI's DNA test. The tests proved that John was not the source of the hairs recovered from the scene of Becker's murder.

138.    By May 2013, the court granted John a new trial based on the DNA testing. Cassilly fought the result.

139.    By July 2013, John was finally able to leave prison after over 32 years, albeit on bond, under conditions, and awaiting a third trial for the murders.

***Cassilly continued to challenge the trial court's granting of a retrial on appeal and to stonewall John's requests for additional discovery pending his retrial***

140.    On July 29, 2013, John requested production of the GSR tests performed on him in 1981, as well as telephone records subpoenaed by the State in 1982. Cassilly did not respond.

141.    On August 16, 2013, the court granted the State's motion to stay proceedings pending its appeal.

142.    On March 10, 2016, the Court of Special Appeals dismissed the State's appeal.

143.    The State continued to fight. On April 18, 2016, the State filed its motion for reconsideration of the writ of actual innocence and requested a hearing.

144.    On September 9, 2016, John requested additional discovery materials in anticipation of his third trial. Cassilly quickly refused to provide any additional discovery materials, but suddenly became agreeable to a plea agreement.

***John enters an Alford plea to end his sentence, maintaining his innocence***

145.    On November 9, 2017, John entered an agreement with prosecutors to enter an *Alford* plea of guilty while formally maintaining his innocence. The decision was difficult for John, but facing a third trial and aware of Cassilly's willingness to violate his rights, break the rules, and withhold and fabricate evidence, he made the decision to end the threat of continued prosecution.

146.    As part of the agreement, Cassilly insisted that he be permitted to destroy all evidence related to John's case.

147.    Following his *Alford* plea, John was sentenced to the time he had already served in prison — 32 years, one month, and 24 days.

***During the latter years of his post-conviction fight, John discovered that a multitude of
material, exculpatory evidence had been withheld from him by investigators***

148.    Toward the latter years of John's post-conviction fight, he was finally provided what
he was told was the entirety of the investigative file. That production revealed a trove of material,
exculpatory evidence that had been withheld from him.

149.    Specifically, investigators had withheld at least the following:

   a.   The statement of Ernest Bohanan, which demonstrated that Hudson and Becker had
        been threatened with violence due to drug debts having nothing to do with John.

   b.   The statement of Debra Mitchell, which demonstrated the same.

   c.   The statement of Stephen Rassa, which showed that Deno Kanaras had planned the
        robbery of Joseph Hudson and nearly attempted it prior to the murder of Hudson and
        Becker or was stopped from committing those murders by Rassa.

   d.   The statement of Paul Vela, which corroborated Rassa's statement.

   e.   The Aschenbach investigative file, which demonstrated that Becker had been an
        informant and had likely informed on dangerous drug dealers leading to police raids in
        the time leading to her murder.

   f.   Documentation of evidence turned over to the FBI which stated that "blood" had been
        washed by Deno Kanaras from his blue Monte Carlo before police seized it.

   g.   Documentation and evidence that Deno Kanaras had washed the clothing he wore on
        the night of the murders before handing it over to police.

   h.   The results of GSR testing performed on John shortly after his arrest.

   i.   The facts that investigators had fabricated and knowingly coerced false evidence relating
        to the murders, primarily through Deno Kanaras.

***As the chief prosecutorial policymaker for the County, Cassilly implemented a policy of
withholding material, exculpatory evidence which led to John's conviction***

150.    In 1981, Harford County was relatively small, with a population of about 140,000
residents. Despite its modest size, John's case and others over the years would demonstrate that Joseph
Cassilly, as the top policymaker for the County, implemented policies whereby state's attorneys,
including Cassilly: (a) generated false testimony and/or knowingly used such false testimony to secure
arrests and convictions; (b) withheld material, exculpatory evidence to do the same; and (c)

intentionally failed to discipline — indeed, affirmatively encouraged — violations of this kind so that it was certain to occur. On information and belief, as its top policymaker, Cassilly implemented a policy whereby state's attorneys did not turn over exculpatory evidence unless specifically requested by a defendant and ordered by a court to do so, in violation of *Brady*'s independent obligation of disclosure. This resulted in repeated *Brady* violations like those at issue here.

151.    The frequency with which, and the timeframe over which, the *Brady* violations in John's 36-year case occurred — almost all while Cassilly served as the State's Attorney and chief policymaker — demonstrate the longstanding pattern of misconduct perpetrated pursuant to Cassilly's policy. Indeed, for his brazen misconduct in John's case, Defendant Cassilly was disbarred.

152.    These policies were made at a local level, applied countywide, and impacted local matters in the county. For purposes of these policies, Mr. Cassilly was a local Harford County employee and not a state actor.

153.    This also resulted in the repeated violation of the constitutional rights of other persons like John Huffington, of which the following are just some examples:

   a.   In a March 1980 case, wherein the Harford County Sheriff and State's Attorney prosecuted public employees for misusing public funds, Joseph Cassilly and William Van Horn coerced two witnesses to make statements implicating defendants, Charles Anderson and Richard Schafer, and withheld exculpatory evidence by refusing to call as witnesses two individuals believed to have exculpatory testimony. County employee and State witness, Edward Bickauskas, told *The Aegis* that Cassilly threatened him and his coworkers, telling them they would lose their jobs "if they gave the kind of answers the state didn't want to hear." *The Aegis* also reported Michael Harrison, another County employee and State witness, said, "[William Van Horn] told me that if we didn't give a statement he would get on the phone and call [my boss] and we could lose our jobs." Further, in a pre-trial motion, lawyers for Anderson and Schafer alleged Cassilly "made 'a deliberate attempt to hide' evidence that was favorable to the defendants" by refusing to call as grand jury witnesses ten individuals who "were known to have positive exculpatory (guilt mitigating) evidence." Defendants Anderson and Schafer were ultimately found not guilty of improperly using County resources for private gain.

   b.   In a November 1984 case, William Van Horn knowingly coerced Ira Gum to give a false statement implicating Norman Geatz in a murder. Joseph Cassilly then prosecuted Geatz. Gum, the State's key witness, testified at Geatz' trial that the first time he was interviewed by Van Horn, Gum did not implicate Geatz but, "[b]ecause he [Van Horn]

wasn't satisfied with the first statement," Gum gave a second statement, falsely implicating Geatz, and in exchange had his 70-year sentence for unrelated charges dropped by the State. When questioned by Geatz' attorney during cross examination about the veracity of his second statement, Gum explained, "[w]hat's good enough for Van Horn is good enough for me." Ultimately, Geatz was acquitted of all charges.

c.  In a February 1985 case, William Van Horn coerced a witness to lie in order to charge Michael McWhirter, who was facing charges for the same murder as Norman Geatz above. Van Horn coerced Maria Aragon to give a false statement implicating McWhirter. Joseph Cassilly then prosecuted McWhirter. Aragon, the State's key witness, testified at McWhirter's trial that she recalled McWhirter's purported confession to her, "only after she was questioned … by a Harford county deputy [Van Horn] who tracked her down" two years later in a federal prison in Houston, Texas. McWhirter and Aragon were incarcerated together in 1982. Harford County Sheriff, Theodore Moyer, told *The Aegis* in 1984, "Van Horn has made five or six trips [to Texas] in the past two years[.]" McWhirter, like Geatz, was also acquitted.

d.  In *Courtney v. Harford County*, 635 A.2d 8 (Md. App. Ct. 1994), Joseph Cassilly coerced Daniel Courtney to implicate others involved in a drug ring. The Court of Special Appeals of Maryland found that Cassilly coerced Courtney, who was facing marijuana distribution charges, by telling him Harford County would "immediately arrest" his wife and place his children "in foster care" if he refused set up controlled drug buys with his customers.

e.  In *Wallace v. State*, 640 A.2d 749 (Md. App. Ct. 1994), a Harford County Sheriff's deputy coerced Craigg Wallace to confess by refusing him medical treatment unless he agreed to withdraw his *Miranda* invocation. Joseph Cassilly then used that confession to prosecute Wallace for assault and battery. The court reversed Wallace's conviction, finding the deputy improperly pressured Wallace to waive his right to counsel and continue the interrogation. For the State, Cassilly argued Wallace spontaneously reinitiated the conversation. The Court of Special Appeals of Maryland disagreed, saying, "[t]he subtle message to the appellant was that if he insisted on his right to counsel, he would pay a price for it."

***Cassilly is disbarred due to his conduct in John's case***

154.  Defendant Cassilly was an Assistant State's Attorney in Harford County from 1977 until March 3, 1983, when he was sworn in as the elected Harford County State's Attorney. He held that post until his retirement in 2019.

155.  In 2018, Mr. Huffington filed a Bar Complaint against Cassilly in the State of Maryland.

156.  On October 22, 2021, Cassilly was disbarred for his misconduct in John's case.

157.  The Maryland Appellate Court concluded that Mr. Cassilly:

… knowingly and intentionally failed to disclose for more than a decade exculpatory evidence that came to light after [John]'s conviction, discarded the evidence, knowingly made false statements of fact to a court and defense counsel concerning the content of the evidence, opposed [John]'s post-conviction petitions and sought to have forensic evidence that was the subject of [John]'s post-trial request for review destroyed, and, during Bar Counsel's investigation, failed to comply with a subpoena to provide a statement under oath.

**John receives a full innocence pardon of his convictions**

158.    On January 13, 2023, John Huffington received a full innocence pardon from Governor Lawrence J. Hogan, Jr., wherein the Governor granted full clemency for Mr. Huffington's convictions given that it had been "shown conclusively" that such convictions "were in error."

159.    On July 5, 2023, John was awarded $2.9 million under the Walter Lomax Act for the years he spent wrongfully imprisoned.

160.    On January 8, 2024, John served notices of his claims under Maryland law, pursuant to the Maryland Tort Claims Act and Local Government Tort Claims Act.

**John has suffered ceaselessly since 1981**

161.    John Huffington spent over 32 years imprisoned for two heinous murders which he did not commit. Ten of those years he spent on Death Row. He was forced to live another four-plus years under the threat of a third trial and did not have his convictions eliminated until 2023.

162.    As a result of the misconduct in this case, John has experienced horrific and permanent injury, including but not limited to the pain of incarceration and the danger, stress, and fear that came with it; the loss of freedom; the loss of time, affection, and support of/with loved ones, including missed birthdays, graduations, funerals, relationships, and other milestones; emotional pain and suffering of the most severe and persistent nature; lost wages and economic opportunity; and extreme emotional distress and torment.

163.    John has nonetheless endeavored to make use of his time on this earth. Upon his release from prison, he secured employment, has worked tirelessly in both the for-profit and non-

profit sectors, including on behalf of those reentering society upon release from prison. Furthermore, he has dedicated himself to improving law enforcement and is sought-after as a trainer of cadet programs with the aims of avoiding the misconduct that occurred in his case.

164.     Despite the fact that he is out of prison and now pardoned, John still suffers the stigma of a life spent marked by these brutal murder convictions. He is pursuing this case to continue the effort to clear his name and expose public corruption.

## CLAIMS

### COUNT 1
**42. U.S.C. § 1983: Deprivation of Liberty Without Due Process of Law**
**(Against Defendants Saneman, Cassilly, Van Horn, Picha, and Comen)**

165.     Plaintiff incorporates the foregoing paragraphs as if fully restated here.

166.     Defendants Saneman, Cassilly, Van Horn, Picha, and Comen, in their personal capacities ("Defendant Officers"), under color of law and within the scope of their employment, deprived Plaintiff of his clearly established constitutional right to due process of law and to a fair trial.

167.     Defendant Officers deprived Plaintiff of his due process rights as described above.

168.     To the extent the above Officers failed to intervene with respect to their fellow officers' unconstitutional conduct, they are liable for the injury caused to Plaintiff.

169.     Had the Defendant Officers' fabrications of evidence, witness intimidation and coercion, and concealment and/or suppression of evidence been documented and/or disclosed, Plaintiff would have proved his innocence, cast doubt on the entire police investigation and prosecution, and impeached critical trial testimony.

170.     The exculpatory and impeachment evidence withheld by the Defendant Officers undermined confidence in the verdict against Plaintiff, and the concealment of this evidence deprived Plaintiff of a fair criminal trial.

171.    Defendant Officers performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and/or with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer in 1981 would have believed such conduct was lawful.

172.    For this count, Plaintiff seeks against each Defendant Officer actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 2
### 42 U.S.C. § 1983: Malicious Prosecution
### (Against Defendants Saneman, Cassilly, Van Horn, Picha, and Comen)

173.    Plaintiff incorporates the foregoing paragraphs as if fully restated here.

174.    The Defendant Officers, in their personal capacities, initiated criminal proceedings against Plaintiff for the murders. Plaintiff was convicted and sentenced to death.

175.    Defendant Officers initiated the proceedings against Plaintiff without probable cause. Defendant Officers knowingly implicated Plaintiff in murders that they knew Plaintiff did not commit.

176.    Plaintiff is innocent of the murders of Joseph Hudson, Jr., and Diane Becker.

177.    The Defendant Officers, acting in the ways described above, acted maliciously or for a purpose other than bringing Plaintiff to justice.

178.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure due to a legal proceeding.

179.    Defendant Officers acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution. Accordingly, Defendant Officers have violated 42 U.S.C. § 1983.

180.    Plaintiff was injured as a direct and proximate result and has sustained damages.

181.    The acts and omissions of Defendant Officers were intentional, wanton, malicious, reckless, and oppressive.

182.    For this count, Plaintiff seeks against Defendant Officers actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 3
### 42 U.S.C. § 1983: False Arrest
### (Against Defendants Saneman, Cassilly, Van Horn, Picha, and Comen)

183.    Plaintiff incorporates the foregoing allegations as if fully restated here.

184.    Defendant Officers, in their personal capacities, arrested and/or initiated criminal proceedings against Plaintiff without probable cause. Defendant Officers knowingly implicated Plaintiff in murders that they knew Plaintiff did not commit.

185.    Plaintiff is innocent of the murders.

186.    Defendant Officers, acting in the ways described above, acted maliciously or for a purpose other than bringing Plaintiff to justice.

187.    Plaintiff suffered a deprivation of liberty consistent with the concept of seizure due to his arrest.

188.    Defendant Officers acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution. Accordingly, Defendant Officers have violated 42 U.S.C. § 1983.

189.    Plaintiff was injured as a direct and proximate result and has sustained damages.

190.    The acts and omissions of Defendant Officers were intentional, wanton, malicious, reckless, and oppressive.

191.    For this count, Plaintiff seeks against Defendant Officers actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 4
### 42 U.S.C. § 1983: *Monell* Liability: Non-Disclosure of Exculpatory Material
### *Brady* and *Napue* Violations
### (Against Defendant Cassilly in his official capacity)

192.    Plaintiff incorporates the foregoing allegations as if fully restated here.

193.    As the top policymaker for the SAO, Joseph Ignatius Cassilly, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy of withholding and/or suppressing material exculpatory evidence from citizens like Huffington.

194.    This policy was known as a result of Cassilly's words, deeds, and due to numerous instances of such misconduct by ASAs prior to and during the time of Huffington's prosecution.

195.    The withholding of material exculpatory evidence against Plaintiff here was the result of Cassilly's policy.

196.    Plaintiff was injured as a direct and proximate result of the above policies, practices, and/or customs and sustained damages as a result.

197.    Cassilly acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, he has violated 42 U.S.C. § 1983.

198.    For this count, Plaintiff seeks actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 5
### 42 U.S.C. § 1983: *Monell* Liability: Evidence Fabrication and Witness Coercion
### (Against Defendant Cassilly in his official capacity)

199.    Plaintiff incorporates the foregoing allegations as if fully restated here.

200.    As the top policymaker for the SAO, Joseph Ignatius Cassilly, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy of evidence fabrication and witness coercion which resulted in the wrongful conviction of citizens like Huffington.

201.    This policy was known as a result of Cassilly's words, deeds, and due to numerous instances of such misconduct by ASAs prior to and during the time of Huffington's prosecution.

202.    Evidence fabrication and witness coercion used against Plaintiff here was the result of was the result of Cassilly's policy.

203.    Plaintiff was injured as a direct and proximate result.

204.    Defendant Cassilly acted under the color of state law to deprive Plaintiff of his rights under the U.S. Constitution as described above. Accordingly, the SAO has violated 42 U.S.C. § 1983.

205.    For this count, Plaintiff seeks actual damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 6
### 42 U.S.C. § 1983: Civil Rights Conspiracy
### (Against Defendants Saneman, Cassilly, Van Horn, Picha, and Comen)

206.    Plaintiff incorporates the foregoing allegations as if fully restated here.

207.    Defendants, in their personal capacities, combined to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose, namely, to arrest, prosecute, and convict John Huffington despite knowing he was innocent of Joseph Hudson's and Diane Becker's murders.

208.    Defendants specifically conspired to fabricate evidence to convict Mr. Huffington and to withhold and suppress evidence demonstrating his innocence.

209.    Plaintiff's constitutional rights were violated as a direct and proximate result of such agreement and actions in furtherance thereof and suffered damages as a result.

210.    For this count, Plaintiff seeks actual damages, punitive damages against the individual defendants, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 7
### Maryland Common Law: False Arrest
### (Against Defendants Saneman, Cassilly, Van Horn, Picha, and Comen)

211.    Plaintiff incorporates the foregoing allegations as if fully restated here.

212.    Plaintiff was unlawfully detained and arrested without probable cause.

213.    The Defendant Officers initiated, effected, and/or participated in that unlawful arrest and detention.

214.    Plaintiff was injured as a direct and proximate result of the Defendant Officers' unlawful actions and sustained damages.

215. For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 8
### Maryland Common Law: False Imprisonment
### (Against Defendants Saneman, Cassily, Van Horn, Picha, and Comen)

216. Plaintiff incorporates the foregoing allegations as if fully restated here.

217. Plaintiff was unlawfully deprived of his liberty, freedom, and property without his consent and without justification by the malicious, intentional, and wanton acts of the Officer Defendants.

218. Defendants' actions demonstrated ill will, improper motivation, evil purpose, and/or actual malice.

219. Plaintiff was injured as a direct and proximate result of the Defendant Officers' unlawful actions and sustained damages.

220. For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 9
### Maryland Common Law: Malicious Prosecution
### (Against Defendants Saneman, Cassily, Van Horn, Picha, and Comen)

221. Plaintiff incorporates the foregoing allegations as if fully restated here.

222. The Defendant Officers caused the commencement or continuation of an original criminal proceeding against Plaintiff when there was no probable cause to do so.

223. Plaintiff is innocent of the murders of Joseph Hudson, Jr., and Diane Becker.

224. The Defendant Officers, acting in the ways described above, acted maliciously or for a purpose other than bringing Plaintiff to justice.

225. Plaintiff was injured as a direct and proximate result of the Defendant Officers' unlawful actions and sustained damages.

226.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 10
### Maryland Common Law: Intentional Infliction of Emotional Distress
### (Against Defendants Saneman, Cassilly, Van Horn, Picha, and Comen )

227.    Plaintiff incorporates the foregoing allegations as if fully restated here.

228.    The Defendant Officers' conduct resulting in Plaintiff's wrongful arrest and decades of wrongful incarceration was extreme and outrageous.

229.    Plaintiff suffered severe emotional distress as a result of Defendants' intentional conduct, which result in wrongful arrest and incarceration for decades as a result of murders he did not commit.

230.    The Defendant Officers desired to inflict severe emotional distress on Plaintiff or knew that severe emotional distress would be certain or substantially certain to result from their conduct.

231.    For this count, Plaintiff seeks actual damages, punitive damages, reasonable attorney's fees, costs, and any other relief the Court deems just and equitable.

## COUNT 11
### Maryland Common Law: Indemnification
### (Against Defendant Harford County)

232.    Plaintiff incorporates the allegations above as if fully restated here.

233.    Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

234.    The Officer Defendants were employees of Harford County, not of the State, and acted within the scope of their employment in committing the misconduct described above.

## PRAYER FOR RELIEF

Plaintiff requests the following relief from the Court:

a.      Compensatory damages against all Defendants in an amount to be determined by a jury;

b.      Punitive damages against all individual Defendants in their personal capacity in an amount to be determined by a jury;

c.      Pre-judgment and post-judgment interest as allowable by law and as ordered by the Court;

d.      Attorney fees' as allowable by law and as ordered by the Court;

e.      Costs; and

f.      Such other relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims herein.


Date:   July 15, 2025                                JOHN HUFFINGTON

                                                    /s/      Hannah Ernstberger
                                                    One of Plaintiff's Attorneys


Hannah Ernstberger
SALLER ERNSTBERGER & MCELROY
10 South Street, #600
Baltimore, MD 21202
(410) 783-7945
hernstberger@sallerlaw.com

Brian Eldridge*
John Marrese*
Jay Kasperbauer*
HART MCLAUGHLIN & ELDRIDGE, LLC
One South Dearborn, Suite 1400
Chicago, IL 60603
(312) 955-0545
beldridge@hmelegal.com
jmarrese@hmelegal.com
jkasperbauer@hmelegal.com

Antonio Romanucci*
Patrick Driscoll*
ROMANUCCI & BLANDIN, LLC

321 N. Clark Street, Suite 900
Chicago, Illinois 60654
P. (312) 458-1000
aromanucci@rblaw.net
pdriscoll@rblaw.net

*Seeking pro hac vice admission