## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| JOHN NORMAN HUFFINGTON, | * |
| Plaintiff, | * |
| v. | * |
| DAVID SANEMAN ET AL., | *    Civil No. 25-2313-BAH |
| Defendants. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff John Norman Huffington ("Plaintiff" or "Huffington") brought suit against the State's Attorney for Harford County (the "Harford County State's Attorney"), David Saneman in his individual capacity ("Saneman"), Diana Cassilly in her capacity as personal representative of the estate of Joseph Ignatius Cassilly ("Cassilly"), James William Van Horn in his capacity as personal representative of the Estate of William Van Horn ("Van Horn"), Bernadette M. Picha in her capacity as personal representative of the Estate of Wesley J. Picha ("Picha"), Jeffrey Gerard Comen in his capacity as personal representative of the Estate of Gerard Comen ("Comen"), and Harford County, Maryland ("Harford County") (collectively "Defendants") alleging eleven counts under 42 U.S.C. § 1983 (Counts 1–6) and several Maryland common law causes of action (Counts 7–11) arising from Huffington's wrongful conviction for the murders of Joseph Hudson, Jr. ("Hudson") and Diane Becker ("Becker"). ECF 16 (amended complaint).[1]

---

[1] The original complaint is docketed at ECF 1.

Pending before the Court are motions to dismiss from nearly all Defendants.[2] *See* ECF 33 (Harford County's motion to dismiss); ECF 34 (Saneman's motion to dismiss); ECF 35 (Cassilly's motion to dismiss); ECF 37 (Picha's motion to dismiss); ECFs 28 and 38 (Comen's original and amended motion to dismiss); ECF 42 (Harford County State's Attorney's motion to dismiss). Huffington has filed responses in opposition to each Defendant's motion. *See* ECF 58 (opposition to ECF 28); ECF 59 (opposition to ECF 33); ECF 60 (opposition to ECF 34); ECF 61 (opposition to ECF 35); ECF 62 (opposition to ECF 37); ECF 63 (opposition to ECF 42). The Defendants have now filed their replies. *See* ECF 74 (Comen's); ECF 75 (Picha's); ECF 76 (Harford County State's Attorney's); ECF 79 (Harford County's); ECF 80 (Saneman's). All filings include memoranda of law.[3]

The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Saneman's motion to dismiss is **GRANTED in part and DENIED in part**, Comen's motion to dismiss is **GRANTED in part**

---

[2] Van Horn has not filed a motion to dismiss or otherwise responded to the complaint. Van Horn was served on September 25, 2025, and his response to the complaint was due by October 16, 2025. *See* ECF 21. On October 22, 2025, the Court issued a letter order noting that it had been in receipt of several filings from the personal representative of the Estate of William Van Horn, including a motion to dismiss, but that it could not accept such filings from the representative without additional information about the status of the representative and/or estate. See ECF 31, at 1 (explaining that the personal representative may proceed on behalf of the estate as a licensed counsel who is a member of the bar of this Court or in his personal capacity *pro se* only if he is the sole beneficiary of the estate). The order instructed the Clerk to return the filings as deficient and set a deadline of 21 days for the personal representative to either re-file with an attorney or provide proof supporting an intention to proceed pro se on behalf of the estate. *Id.* The personal representative has not responded or attempted to submit any other filings since that deadline. Accordingly, Huffington will be ordered to file and serve by mail on the Estate of William Van Horn a motion for entry of default by the Clerk and a motion for default judgment, or provide a report as to why such motions would be inappropriate, within 30 days of this decision issuing.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

and **DENIED in part**, Cassilly's motion to dismiss is **GRANTED in part and DENIED in part**, Picha's motion to dismiss is **GRANTED**, Harford County's motion to dismiss is **GRANTED**, and the Harford County State's Attorney's motion to dismiss is **GRANTED**.

## I.    BACKGROUND

The Court accepts as true all well-pleaded facts in Plaintiff's complaint and draws all reasonable factual inferences in his favor. *See Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013). Over 40 years ago, then-18-year-old Huffington was wrongfully convicted for the murders of Joseph Hudson, Jr. and Diane Becker. ECF 16, at 2 ¶ 1. As a result of that conviction, Huffington spent over 32 years in prison—10 of those on death row. *Id.* ¶ 2.

According to Huffington, "[f]rom the outset, Harford County investigators zeroed-in on a 25-year-old man named Deno Kanaras [("Deno")] for the murders." *Id.* at 3 ¶ 4. Deno "was the son of a well-known local businessman, whose restaurant was a fixture in the community and sat in the parking lot of the Harford County Sheriff's Office investigating the murders." *Id.* Huffington alleges that "the Sheriff's Office and Harford County State's Attorney's Office embarked upon a knowingly improper investigation which deferred to the Kanaras family." *Id.* ¶ 5. Investigators allegedly "alerted" Deno's "father of the investigation, permitted Deno hours to clean and doctor evidence of the crime in front of investigators, and rather than obtain a search warrant of the Kanaras home for evidence, permitted the Kanaras family to select the evidence to turn-over." *Id.* "In turn, Harford County investigators used Deno to fabricate a patently false and ever-evolving story implicating" Huffington, "who had been with Deno and the victims earlier on the night of the murders." *Id.*

3

At the heart of this case is the conduct of Cassilly,[4] the Harford County Assistant State's Attorney and later State's Attorney that investigated and prosecuted Huffington for the murders, and who was eventually disbarred by the Supreme Court of Maryland for his conduct related to this case. *See id.* at 5 ¶ 19. Cassilly was elected State's Attorney from 1983 until his retirement in 2019. *Id.* Cassilly was "the chief policymaker for the Harford County State's Attorney's Office," or "SAO." *Id.* Huffington also brings suit against Harford County, along with other individuals involved in the investigation of the murders. Defendants Saneman, Van Horn, and Picha were deputies with the Harford County Sheriff's Office during the relevant period. *Id.* at 5 ¶ 18, at 6 ¶¶ 20–22. Defendant Comen was an Assistant State's Attorney for Harford County who participated in investigating and prosecuting Huffington for the murders. *Id.* at 6 ¶ 22.

## A.    The Murders

In 1981, 30-year-old Hudson and 21-year-old Becker were dating and lived together at the Long Bar Harbor Campground in Abingdon, Maryland, with Becker's then four-year-old child. *Id.* at 7 ¶ 24. Hudson was a local disc jockey and alleged drug dealer, and Becker was also purportedly involved in dealing drugs. *Id.* On the evening of May 24, until the early morning hours of May 25, Hudson had been DJing at The Golden 40 club ("Club 40") nearby with their campground neighbors, celebrating Becker's and a neighbor's birthdays. *Id.* ¶ 29.

Deno and eighteen-year-old Huffington were also at Club 40 that night. *Id.* "Deno had driven [Huffington] there in Deno's 1979 blue Chevy Monte Carlo." *Id.* ¶ 30. "Deno was looking for cocaine and knew Hudson might be able to get some." *Id.* "Deno spoke to Hudson and they agreed to return to the Campground after the club closed, where Hudson would sell him cocaine." *Id.* Becker was also engaged in the sale of cocaine that night. *Id.* ¶ 31. At one point during the

---

[4] Cassilly died last year. *See* ECF 16, at 5 ¶ 19. Several other Defendants in this matter are also now deceased, and so Huffington bring this action against their estates. *See id.* at 5–6.

evening, she returned to the campground "and sold cocaine to a man . . . who had followed her home from the club." *Id.* at 8 ¶ 31. "After the sale," however, "Becker returned to the club." *Id.* When the club closed, Deno and Huffington got into Deno's car and followed Hudson, Becker, and their neighbors back to the campground. *Id.* ¶ 32.

Upon arriving back at the campground, Becker paid a babysitter watching her four-year-old, and the babysitter left. *Id.* ¶ 33. Hudson and Becker's neighbors made plans to meet the next day and went back to their trailer for the night. *Id.* Deno and Huffington then went into Hudson and Becker's trailer so "Deno could buy cocaine from Hudson, which he did." *Id.* Afterwards, Deno drove Huffington "home to the Greenbriar Apartments in Bel Air, Maryland." *Id.* ¶ 34. Huffington arrived home "between 3:00 and 3:30 a.m." and "soon received a call from a friend" who asked Huffington "if he wanted to come to a house party," an invitation Huffington says he declined. *Id.* "Deno left [Huffington]'s apartment, and [Huffington] went to bed." *Id.*

The next morning, Huffington alleges that he was "awoken by Deno who had returned" to Huffington's apartment. *Id.* ¶ 35. According to Huffington, "Deno looked wired, as if he had not slept all night." *Id.* "Deno asked [Huffington] to accompany him to" a convention in Cecil County, Maryland, and Huffington agreed. *Id.* The pair attended the convention, but only for a short time. *Id.* ¶ 36. "While there, Deno fixated on obtaining a wristband for proof of attendance at the festival." *Id.* "He offered money to a festivalgoer to obtain one and did." *Id.* Around that time, Deno told Huffington that "if anyone asked," Huffington "should say that he was with Deno" at the convention "all weekend." *Id.* at 9 ¶ 37. Huffington agreed and "did not think much of Deno's request." *Id.* Deno and Huffington drove home from the convention and made a few stops together. *See id.* ¶¶ 38–40. Deno eventually dropped Huffington off at a furniture store. *Id.* ¶ 39. "After that, [Huffington] did not see Deno again outside of a courtroom." *Id.* Later that day,

5

Huffington drove to his girlfriend's house. *Id.* ¶ 40. Deno's cousin "stopped by and informed [Huffington] that the Harford County Sheriff Department wished to speak with him." *Id.*

**B.    The Investigation**

The same morning, May 25, 1981, Hudson and Becker were found dead in separate locations. *Id.* at 7 ¶ 25. Becker was found repeatedly stabbed and bludgeoned to death in her bed in the campground trailer. *Id.* ¶ 27. Her four-year-old had been sleeping elsewhere in the trailer and was physically unharmed. *Id.* Hudson was later found shot to death on a relatively secluded rural road dotted with some homes, about three miles from the campground. *Id.* ¶ 26.

The police were first led to Becker's body by one of the neighbors who had been at Club· 40 with them the night prior. *Id.* at 9 ¶ 41. In addition to Becker's injuries, which were numerous, police observed "extensive blood on the bed, walls, floor, exterior wall of the trailer, and the ground outside where blood had seeped through the trailer." *Id.* Apparently, "several items that· appeared to have fallen from cabinets surrounding the bed did not have blood spatter on them, which suggested that the murderer had ransacked those cabinets after the murder." *Id.* at 9–10 ¶ 41. "Police quickly interviewed" a neighbor who informed police that "the evening before two men followed him, his wife, Hudson, and Becker home from" Club 40 and that Becker had called one of them "Deno." *Id.* at 10 ¶ 42.

"At approximately 1:35 p.m.," Saneman and Van Horn went to Club 40 and, "while there, received a call that another body had been found" off a road near Emmorton, Maryland. *Id.* ¶ 43. "Saneman and Van Horn went to the scene . ·. . , where they identified Hudson as the decedent." *Id.* ¶ 44. "Hudson was lying face down and had gunshot wounds to the right side of his head, the top of his skull, and his back. Two spent rounds were lying near the body, within roughly three to five feet. The rounds were determined to be .38 caliber. It appeared that the subject had grabbed foliage near the road before he died." *Id.*

Hudson's best friend, Ernest Bohanan ("Bohanan"), had come to the campground briefly to speak with investigators and had "left without providing much information, but phoned police later, around 6:30 p.m., to tell . . . Picha that he could not talk down at the [c]ampground because of all the people nearby, but that he knew who killed [ ] Hudson." *Id.* ¶ 45. According to Bohanan, Hudson had told him he "was in serious debt to his drug suppliers, namely a man named 'Phillip' who had paid a visit to Hudson's trailer two weeks earlier and threatened him." *Id.* Apparently "Phillip and his associates would 'kill him if he didn't pay up,'" and "Hudson had not paid-up." *Id.* "Additional witnesses would tell police that Hudson and Becker were terrified for that reason and others." *Id.* For example, one of Becker's friends, Debra Mitchell ("Mitchell"), told police that "Hudson owed Phillip $4,000 for cocaine, but that they were not using their cash on hand to repay him." *Id.* ¶ 46. At the time of the murders, Becker had also been "acting as a drug informant for police." *Id.* at 11 ¶ 47. Information related to "Phillip" or Becker's status as an informant was not disclosed to Huffington, and "[i]t is still unknown whether investigators ever followed these leads." *Id.* ¶ 48–49.

Based on the neighbor's statement regarding "Deno," "police quickly identified [a] person of interest" as "Deno Kanaras." *Id.* ¶ 50. "Deno came from a family well known in the local business community as the owner of the Red Fox Lounge and the Fox's Den, restaurants in Bel Air." *Id.* ¶ 51. "The Red Fox Lounge was situated right next door to the Harford County Sheriff's Office and was frequented by law enforcement." *Id.* "Deno worked at the Fox's Den for a time before his family terminated his employment for stealing." *Id.*

Huffington alleges that "Harford County investigators permitted Deno extraordinary latitude and paid him and his family an unusual degree of deference throughout the investigation" into Hudson and Becker's murders. *Id.* ¶ 52. Rather than calling Deno, "[i]nvestigators first called

7

Deno's father, John Kanaras, the owner of Red Fox Lounge and the Fox's Den, to notify him that they needed to speak to Deno in relation to the murders." *Id.* ¶ 53. John Kanaras told them "Deno was living with him" and "immediately called Deno at home and notified him." *Id.* at 11–12 ¶ 53. But "rather than immediately question Deno, investigators waited hours before approaching him, allowing his father to notify him and permitting Deno to tamper with evidence," according to Huffington. *Id.* at 12 ¶ 53. For example, Saneman and Van Horn allegedly "went to Deno's parents' home and identified Deno's Monte Carlo outside the home," but "left and went back to the Sheriff's Office for several hours." *Id.* ¶ 54. "Their time is unaccounted for in investigative records in [ ] Huffington's possession." *Id.*

At "[a]bout 10:45 p.m., Saneman and Van Horn finally returned to Deno's home." *Id.* ¶ 55. "While driving" back, "they passed Deno driving his Monte Carlo." *Id.* "Deno returned home a short time later and the deputies approached his garage and Deno let them in." *Id.* "The deputies interviewed him [at] about 11:00 p.m. that night at the kitchen table while Deno drank a cup of tea." *Id.* "The deputies either did not ask, or did not document, where Deno had been with his Monte Carlo in the intervening hours." *Id.* ¶ 56. "Moreover, when they asked for his whereabouts the night before, Deno lied, telling them the story he had asked John to tell: that he had gone straight from the Golden 40" to the convention. *Id.* "[W]hen Saneman and Van Horn informed him that they knew he was lying, Deno quickly stated that he and 'John' [Huffington] had stopped at the [c]ampground only to get a 'couple of joints' from Hudson and Becker before driving to the" convention. *Id.* ¶ 57. Deno told investigators he did not know "John's" last name but that his cousin would, and the investigators called Deno's cousin to confirm that the "John" referenced was "John Huffington." *Id.* at 13 ¶ 59.

"The deputies obtained a consent search of Deno's car" and "determined that the floor mats were wet, the windows were recently wiped, and that the inside of the vehicle had very recently been cleaned." *Id.* at 12 ¶ 58. The floor mats were taken "for testing," but investigators either "did not ask, or did not document," why the mats had been cleaned. *Id.* Saneman and Van Horn did not seek a search warrant for the Kanaras' home at that time or any time thereafter. *Id.* "Deno was not arrested and investigators left." *Id.* at 13 ¶ 60.

Huffington "went directly to the Sheriff's Office without an attorney" after being notified by Deno's cousin. *Id.* ¶ 61. "He arrived at about 12:30 a.m. on May 26, 1981," and Saneman and Van Horn interviewed him. *Id.* Huffington told investigators that he "had gone to the trailer with Deno and then told investigators what Deno asked him to: that Deno and he went straight to the [convention] from there." *Id.* ¶ 62. Huffington consented to a search of his apartment and also offered to participate in a polygraph examination, but investigators declined. *Id.*

Several hours later, on the morning of May 26, 1981, Hudson and Becker's bodies were examined. *Id.* ¶¶ 63–64. Becker "had dozens of deep stab wounds, and been violently beaten, and her throat slit." *Id.* ¶ 63. She "appeared to have been stabbed 'with some type of hunting knife with a thick blade,'" and "her head 'was severely depressed'" likely by "some type of blunt object" like a "sharp edge or corner." *Id.* Hudson was "shot five times," including in the head, in the chin, in the middle back area, and inside his left elbow. *Id.* ¶ 64. "The medical examiner removed two spent bullet rounds and gave them to an investigator who took them as evidence." *Id.*

At approximately "11:22 a.m." that same day, "Deno and his father came to the Harford County SAO with two attorneys." *Id.* at 14 ¶ 65. Huffington alleges that Saneman, Van Horn, and Comen "concocted a new statement relating to the murders through Deno," for which "Cassilly was also present and involved . . . or, at a minimum, was aware that" Comen "was preparing

9

Deno's statement to falsely implicate" Huffington." *Id.* ¶ 66. "Deno's new statement was an incredible story that painted the 25-year-old as under duress from the 18-year-old John Huffington. Deno claimed that John hatched a plan to steal money from Hudson and Becker's trailer and murder them, and that Deno merely did what [Huffington] demanded." *Id.* at 14–15, ¶ 69. Huffington alleges that "Deno believed that he could avoid jail if he worked with investigators to implicate" Huffington. *Id.* at 16 ¶ 74. Deno was still charged, however, although he eventually "receive[d] leniency: Prosecutors would not seek the death penalty against him." *Id.* "Further, Cassilly would write a favorable letter to the parole board and testify live at a parole board hearing for Deno[.]" *Id.* at 17 ¶ 74.

At the Harford County SAO, "Deno claimed that after leaving the trailer the first time, they returned and [Huffington] lured Hudson to Deno's car by claiming he had a buyer for Hudson's drugs. Deno claimed that at about 4:00 a.m., he drove with Hudson in the front seat and [Huffington] in the back, with [Huffington] directing them to a spot on Wheel Road." *Id.* at 15 ¶ 69. Deno claimed he had no knowledge of where Huffington "was taking them or who they were going to meet." *Id.* "When they arrived Deno claimed that he and Hudson walked ahead while [Huffington] was four or five steps behind them and that [Huffington] just began shooting, reloaded 'real fast,' and then shot Hudson in the head." *Id.* Deno "claimed that [Huffington] told him to drive him back to the trailer because Deno 'heard [Hudson] talking about having several thousand dollars cash in his trailer.'" *Id.* (second alteration in original).

"Deno further stated that, a little after 5:00 a.m., when they were in the trailer and Becker and her child remained sleeping, [Huffington] ordered Deno to search for cash, and Deno found about $2,300 there. Deno claimed then that [Huffington] instructed him to kill the sleeping Becker, but Deno refused." *Id.* ¶ 70. "According to Deno, that is when [Huffington] grabbed 'a big

10

whiskey bottle' next to Becker's bed, started beating Becker's head with it, before he then took a knife out of his pocket and started stabbing Becker." *Id.* "Deno claimed that he left the trailer, and that [Huffington] followed him out and demanded that Deno drive him home." *Id.* "In the car, Deno claimed [that Huffington] threatened him and so he drove him back to [Huffington]'s apartment, where [Huffington] counted the money, changed his clothes, and washed up." *Id.* ¶ 71. "According to Deno, [Huffington] then told him to drive him" to the Conowingo Dam, and Deno stated that "he obliged out of fear and that [Huffington] 'burned a letter and threw the gun and a knife into a stream' and then told Deno to drive him to the" convention. *Id.* After that, Deno claimed Huffington told him to drop him off at a store and that Deno "went straight home." *Id.* According to Huffington, Saneman, Van Horn, and Comen also fabricated additional details of the story with Deno, including, for example, where certain evidence could be found, a motive for killing Becker related to Hudson telling her where he had gone and who he had gone with, and details related to the weapons used and the money stolen. *Id.* at 16 ¶ 72. The interview concluded at 12:15 p.m. *Id.* ¶ 73.

The investigators allowed Deno to "leave again with a plan to meet later that day, when Deno would show them where evidence of the crime had allegedly been deposited." *Id.* at 17 ¶ 75. At "about 1:00 p.m., Saneman and Van Horn met Deno and his attorney at a Hardees Restaurant located on Route 22, in the Campus Hills Shopping Center," near the store where Deno had described dropping Huffington off. *Id.* ¶ 76. "Deno and his attorney [then] took investigators to what Deno said was discarded evidence of the murders." *Id.* "In the rear dumpster, about 1:35 p.m., [ ] Van Horn found 'a pair of pants in a brown paper bag.'" *Id.* ¶ 77. Van Horn then left the store and returned to the Sheriff's Office to meet Huffington and his attorney, at which point Huffington was arrested for the murders. *Id.* ¶ 78. Shortly after he was arrested, investigators

11

performed a "gunshot residue test" on Huffington. *Id.* ¶ 79. Huffington never received the results of this test, nor "was it ever used in any fashion of which he is aware." *Id.*

As Van Horn was arresting Huffington, Saneman was accompanying Deno and his attorney to a dirt road paralleling a stream. *Id.* ¶ 80. "Deno informed Saneman that 'he recalled pulling off onto the lefthand shoulder of the road at a pulloff area next to the stream,'" although Deno "had not mentioned" the road "in his prior statements to police." *Id.* There, "Deno claimed that 'Huffington took the purse belonging to Diane Becker along with a note that was found in the trailer and he burned these items on the bank of the stream and then poured dirt over the top of them to cover the ashes.'" *Id.* Deno "further advised that [Huffington] threw *a box* of .38 ammunition into the middle of the stream and also removed several live rounds from his pants pocket . . . and threw them in to the edge of the stream," and the whiskey bottle he used to strike Becker into the wooded area on the opposite side of the road. *Id.* at 17–18 ¶ 80. Investigators did not find any of that evidence in those locations. *Id.* at 18 ¶ 80. Deno next suggested that investigators "proceed north toward Conowingo Dam to locate the gun and knife." *Id.*

"Deno guided Saneman across the dam" and, "[a]ccording to reports, Deno located 'a revolver in a holster and a hunting knife in a sheath lying in the water[.]'" *Id.* ¶ 81. Records indicate the gun was found fully loaded and the knife was in a sheath. *See id.* "Saneman asked Deno if he knew where [Huffington] had obtained the gun, but Deno said that he did not know." *Id.* ¶ 82. But "upon prodding from his attorney, Deno then admitted that he (Deno) had bought the gun 'about a month ago . . . had the gun for about a week and he fired a couple bullets from the weapon'" until a week prior had "given the gun to Huffington in exchange for some cocaine." *Id.* Saneman, Deno, and his attorney eventually returned to the prior road, where "after nearly another hour of searching, they were 'finally able to locate the area where the purse was burned

along the bank.'" *Id.* ¶ 83. Deno also was able to point out where the live rounds were on the edge of the bank. *Id.* There were "six live rounds," but "[n]o box of .38 caliber ammunition was found." *Id.* Shortly thereafter, "on the opposite side of the road, Saneman and Deno identified a clear, one-gallon Smirnoff-branded vodka bottle—not a whiskey bottle—'lying in the wooded area.'" *Id.* ¶ 84. The bottle "contained what appeared to be extensive blood stains on the bottom area and label area of the bottle." *Id.* at 18–19 ¶ 84. Deno claimed that he had only picked the bottle up near the top when it was removed from his vehicle. *Id.* at 19 ¶ 85.

Picha photographed and took the items from this search into evidence except for the revolver and knife, "which Saneman kept in the trunk of his car." *Id.* ¶ 84. Saneman then "dropped Deno and his attorney back off at the Hardees Restaurant." *Id.* ¶ 85. At about 6:30 p.m. that day, "Deno was charged with the murders of Hudson and Becker and was released on a $200,000 bond." *Id.* ¶ 86. "Shortly after Deno and his attorney were dropped off," a person looking around the area where Hudson's body was located "found a partially deformed lead bullet that investigators had overlooked," which police obtained "sometime after 8:00 p.m." *Id.* ¶ 87.

On May 27, 1981, Van Horn and Saneman "applied for a search warrant for [Huffington]'s apartment," stating that they believed several pieces of evidence related to the murder were there, including clothing, money, jewelry, cocaine, and cleaning materials. *Id.* ¶ 88. The same day, police learned from a witness that lived near where Hudson's body had been found that "he had personally seen Deno visit" another individual "at that location 'on several occasions, maybe 12 times' in his Monte Carlo." *Id.* at 20 ¶ 89. "At about 2:00 p.m., Van Horn and Saneman took another statement from Deno." *Id.* ¶ 90. After Deno repeated that both he and Huffington "had returned to the trailer a little after 4:00 a.m.," Huffington alleges that "Van Horn and Saneman encouraged Deno to provide additional false details to improve his story." *Id.*; *see also id.* at 20–

13

21 ¶¶ 90–91 (listing additional details provided by Deno at this meeting). At this meeting, "Deno admitted having been to the house on Wheel Road several times before." *Id.* at 21 ¶ 92. Later that afternoon, "Saneman gave the knife, sheath, gun, and holster to Picha" from the trunk of his vehicle. *Id.* at 22 ¶ 98. Around the same time, Picha received evidence from Deno's attorney's law office, including clothing that had been washed. *Id.* ¶ 99. A few hours later, Picha went to the Kanaras residence "at the request of Deno's attorney" to pick up items of clothing that "Deno claimed he had been wearing during the murders"—a leather jacket and one pair of boots. *Id.* at 22–23 ¶ 100.

## C.    The Indictments

"On June 16, 1981, Deno testified before the grand jury to aid prosecutors in indicting" Huffington. *Id.* ¶ 107. Deno's narrative apparently "changed in several key respects" by that time. *Id.* "The grand jury returned an indictment against [Huffington] for the murders and related offenses the same day." *Id.* "On July 28, 1981, a grand jury indicted Deno for the same offenses." *Id.*

## D.    Other Evidence Emerges

Following the initial investigation and indictments, Huffington asserts that authorities "received abundant information that Deno had a drug abuse problem and was in serious debt." *Id.* at 23 ¶ 102. For example, in early June of 1981, Deno's best friend, Stephen Rassa ("Rassa"), told police that "a week prior to the murders, he and Deno had used a lot of 'crank'" a week prior to the murders and had said he "wanted to rob and kill Hudson." *Id.* ¶ 103. Rassa said that "Deno repeated this multiple times, told him he had a gun and a knife, and [that] they even visited Hudson's trailer where Deno bought cocaine from Hudson." *Id.* The friend also described the "same five-shot, imported revolver in Deno's possession," consistent with the gun Deno led investigators to. *Id.* Rassa described being "frightened by Deno and extremely frightened that

14

Deno planned to rob Hudson" when they visited the trailer. *Id.* And when Rassa "saw the news story about Hudson's and Becker's murders, he worried it was Deno." *Id.* ¶ 104. Rassa also expressed surprise at Huffington's implication, as he believed Huffington and Deno "were not close." *Id.* Around the same time, another person in contact with Rassa, Paul Vela ("Vela"), substantiated the story about Deno's plan. *Id.* at 24 ¶ 105. In late August of 1981, Deno's friend again spoke to Van Horn and Saneman about Deno's prior statements to him related to robbing and killing Hudson. *Id.* ¶ 109.

"On October 12, 1981, Saneman and Comen interviewed Becker's babysitter" again. *Id.* at 25 ¶ 110. This time, the 16-year-old told them she observed a whiskey bottle in the trailer that night of the murder while she was babysitting that was "half full of pennies and . . . had a full bottle cap on top." *Id.* "When shown the Smirnoff vodka bottle found at" the road Deno took police to, however, the babysitter said "she was pretty sure that the bottle was the same" but if it had been the same bottle, it was half full of pennies at the time. *Id.* Saneman and Van Horn also spoke to an individual on October 16, 1981 who "identified the revolver as the gun Deno tried to sell him not long before the murders." *Id.* ¶ 111.

### E.  The Convictions

#### 1.  Huffington's Trial

After a change of venue, Huffington's trial commenced in the Circuit Court of Caroline County in November of 1981, and Comen and Cassilly tried the case. *Id.* ¶ 112. Comen and Cassilly did not call Deno as a witness "due to his lack of credibility," and instead requested he be called "as a 'court's witness,'" meaning that only the court could question him. *Id.* ¶ 113. "The court agreed to call Deno but required Cassilly and Comen to question" him. *Id.* Huffington alleges that "[b]ased on Deno's false testimony, [Huffington] was convicted of two counts of felony murder and sentenced to death." *Id.*

15

Huffington "appealed his convictions, and, on December 6, 1982, [Maryland's highest] appellate court reversed" and remanded the case for a new trial. *Id.* at 26 ¶ 115 (citing *Huffington v. State*, 452 A.2d 1211 (Md. 1982)). "On remand, venue for trial was changed to Frederick County." *Id.* ¶ 116. In November of 1983, he was re-tried, again by Comen and Cassilly, who was now the State's Attorney of Harford County. *Id.* "The case was again tried largely on Deno's testimony," along with FBI agent testimony "that hair samples recovered from Becker's trailer 'microscopically matched the head hairs of [ ] Huffington.'" *Id.* ¶ 117. Huffington "was again convicted of two counts of felony murder and sentenced to death." *Id.* ¶ 118. "On November 13, 1985, the appellate court affirmed [Huffington]'s judgments of conviction." *Id.* ¶ 119 (citing *Huffington v. State*, 500 A.2d 272 (Md. 1985)).

### 2. Deno's Trial

Deno's trial took place in the Circuit Court of Caroline County over ten days in late March and early April of 1982. *Id.* at 25 ¶ 114. Cassilly and Comen did not seek the death penalty. *Id.* "Deno was tried and convicted of the murder of Becker, but not Hudson, and sentenced to life." *Id.* Deno was granted parole and released from prison in 2008, years before Huffington obtained release. *Id.* at 17 ¶ 74. As promised, Cassilly wrote a favorable letter to the parole board and testified live at a parole board hearing for Deno. *See id.*

### F. Huffington's Quest to Prove His Innocence

Throughout the intervening decades between Huffington's conviction and the present day, Huffington filed postconviction motions contesting his convictions. *See id.* at 26 ¶ 120. "On January 8, 1991, the circuit court granted, in part, a petition for postconviction relief and ordered a new sentencing hearing." *Id.* "In December 1991, the State received blood testing results of the jacket [Huffington] was wearing on the night of the murders which Deno claimed had blood on it. Testing demonstrated that there was no blood on the jacket." *Id.* ¶ 121. Despite the upcoming

resentencing, the Harford County SAO did not disclose those results to Huffington. *See id.* Huffington was resentenced to life imprisonment in 1992. *Id.* ¶ 122.

Additional appeals and post-conviction proceedings followed. *Id.* ¶ 123. Throughout that time, Huffington "requested all documents related to his investigation and prosecution." *Id.* "[T]he State replied that much of the information was provided in discovery during the trials and denied the remainder of the requests, still without disclosing the results of the jacket testing." *Id.* Huffington's second postconviction petition was denied, as was his application for leave to appeal the denial. *Id.* at 27 ¶ 124.

In June of 1997, the U.S. Department of Justice ("DOJ") "wrote to Cassilly to inform him of an investigation into Agent [Michael] Malone," the FBI agent who provided testimony at Huffington's trial that hair samples recovered from Becker's trailer matched Huffington's hair. *Id.* ¶ 125; *id.* at 26 ¶ 117. In October of 1999, "an FBI investigator examined Malone's testing and results in [Huffington]'s case and determined that there were problems with the methods, analysis, and testimony." *Id.* at 27 ¶ 127. Later that month "a senior DOJ attorney sent a letter to Cassilly, informing him that Malone had testified falsely in [Huffington]'s case." *Id.* ¶ 128. Although Huffington learned of the June 1997 letter noting the inquiry into Malone's work, Cassilly did not relay the 1999 letter confirming Malone's problematic testimony to Huffington or his attorneys. *Id.* ¶ 129. "In 2003, [Huffington] petitioned the court for DNA testing of evidence used to obtain his conviction. Meanwhile Cassilly moved to destroy the hair evidence and other physical evidence in the case." *Id.* ¶ 130. However, Cassilly's request was not approved. *See id.*

In November of 2010, Huffington "filed a petition for a writ of actual innocence, based on evidence related to [the FBI agent]'s false testimony." *Id.* ¶ 131. Huffington's request was based on the 1997 DOJ letter along with "the emergence of science discrediting numerous forensic

17

analyses conducted in the case, including the microscopic hair analysis." *Id.* Cassilly asserted in response to Huffington's petition that no evidence had been presented to undermine the FBI agent's conclusion, apparently without any mention of the 1999 DOJ letter. *Id.* at 27–28 ¶ 131. In January of 2011, Huffington also renewed his request for "the results of investigations or examinations conducted on his body or any of his clothing and/or belongings." *Id.* at 28 ¶ 132. The State responded that no tests had been completed since the second trial, failing to disclose the results of the jacket testing. *Id.*

In March of 2011, after oral argument on Huffington's petition, the hearing court "ordered the State to determine whether the hair evidence from [Huffington]'s trials could be tested for DNA identification." *Id.* ¶ 133. Testing remained uncompleted in November of 2011. *See id.* ¶¶ 134–35. The existence of a 1999 DOJ letter had come to light at that time, but Cassilly claimed he was unable to locate a copy. *See id.* ¶ 134. Huffington's attorneys ended up receiving a copy of the letter from a reporter and filed a supplemental petition in November of 2011 with the 1999 DOJ letter included. *Id.* ¶¶ 135–36. In April of 2013, "the State transmitted to [Huffington] the results of the FBI's DNA test," which proved Huffington was "not the source of the hairs recovered from the scene of Becker's murder." *Id.* ¶ 137. Huffington was granted a new trial in May of 2013 based on the results of the DNA testing, which Cassilly opposed. *Id.* at 29 ¶ 138. In July of 2013, Huffington was granted bond under conditions, leaving prison for the first time in over 32 years. *Id.* ¶ 139. Even after all that had come to light, the State litigated Huffington's case heavily until November of 2017. *See id.* ¶¶ 140–45.

Eventually, Huffington received "what he was told was the entirety of the investigative file" related to his case." *Id.* at 30 ¶ 148. Materials Huffington had never seen before included, for example, Bohanan's and Mitchell's statements related to the threats Hudson and Becker had

18

received related to their cocaine sales; Becker's status as an informant; Rassa's statement about Deno's plan to rob and kill Hudson, along with Vela's corroborating statement; and documentation that Deno had washed his car and clothing that he wore on the night of the murders before that evidence had been obtained by police. *See id.*

## G.    This Lawsuit

In November of 2017, Cassilly and Huffington agreed that Huffington would enter an *Alford* plea, whereby Huffington could formally maintain his innocence but receive a sentence instead of going to trial a third time.[5] *Id.* at 3 ¶ 8; *see also Media Gen. Operations, Inc. v. Richmond Newspapers Pro. Ass'n*, 36 F. App'x 126, 135 n.2 (4th Cir. 2002) (Gregory, J., concurring) ("In certain cases, a defendant may plead guilty but not admit to factual guilt. Such a plea is known as an *Alford* plea." (citing *North Carolina v. Alford*, 400 U.S. 25 (1970))).  As part of the plea agreement, Cassilly was "permitted to destroy all evidence related to [Huffington]'s case." ECF 16, at 29 ¶ 146.  In 2018, Huffington filed a bar complaint against Cassilly and in 2021, Cassilly was disbarred for his misconduct in Huffington's case. *Id.* at 32 ¶ 156.

On January 13, 2023, Huffington received a full pardon from then-Governor of Maryland Larry Hogan for Hudson and Becker's murders. *Id.* at 4 ¶ 10, at 33 ¶ 158. "On July 5, 2023, the State of Maryland awarded [Huffington] $2.9 million under the Walter Lomax Act for the years he spent wrongfully imprisoned." *Id.* at 4 ¶ 11. Now-Governor of Maryland Wes Moore declared in conjunction with that award that Huffington "was 'erroneously convicted' by State's Attorney Joseph Cassilly." *Id.* Huffington now brings this suit, filed on July 16, 2025, ECF 1, "to fully expose the official misconduct" that led to his wrongful conviction, ECF 16, at 4 ¶ 12.  On

---

[5] *See Alford Plea*, Black's Law Dictionary (12th ed. 2024) ("A guilty plea that a defendant enters as part of a plea bargain without admitting guilt.").

September 9, 2025, Huffington filed the amended complaint, the operative pleading. *See* ECF 16.

Defendants' motions to dismiss came shortly thereafter, which are now all ripe for resolution.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits.". *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III.    ANALYSIS

Huffington brings numerous claims against numerous Defendants. Counts 1 through 6 allege violations of the United States Constitution pursuant to 42 U.S.C. § 1983. *See* ECF 16, at 34–38. Counts 7 through 11 are asserted under Maryland common law. *See id.* at 38–40. Some of the federal and state counts parallel each other.

20

In Count 1, Huffington alleges that Saneman, Cassilly, Van Horn, Picha and Comen in their personal capacities "deprived Plaintiff of his clearly established constitutional right to due process of law and to a fair trial." *Id.* at 34 ¶ 166. Huffington alleges that these Defendants directly deprived Huffington of his constitutional rights and also pursues their liability "[t]o the extent [they] failed to intervene with respect to their fellow officers' unconstitutional conduct." *Id.* ¶ 168. In Count 2, Huffington alleges malicious prosecution against the same set of Defendants, alleging that those Defendants "initiated the proceedings against Plaintiff without probable cause" and "knowingly implicated Plaintiff in murders that they knew Plaintiff did not commit." *Id.* at 35 ¶ 175. Count 9 alleges a malicious prosecution claim under Maryland common law against the same Defendants. *See id.* at 39 ¶ 222.

In Count 3, Huffington alleges a § 1983 false arrest claim against the same set of Defendants, likewise arguing that those Defendants "arrested and/or initiated criminal proceedings against Plaintiff without probable cause." *Id.* at 36 ¶ 184. Counts 7 and 8 allege false arrest and false imprisonment claims, respectively, against the same Defendants under Maryland common law. *Id.* at 38 ¶ 213. Count 6 likewise asserts against the same set of Defendants a civil conspiracy claim pursuant to § 1983. *See id.* at 38 ¶ 207. Specifically, Huffington alleges that Defendants "combined to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose, namely, to arrest, prosecute, and convict" Huffington "despite knowing he was innocent" of Hudson and Becker's murders. *Id.*

Counts 4 and 5 of the amended complaint both assert a *Monell* claim against Cassilly in his official capacity as the "top policymaker for the SAO." *Id.* at 37 ¶¶ 193, 200. Count 4, however, alleges that Cassilly "implemented, enforced, encouraged, and sanctioned a policy of withholding and/or *suppressing material exculpatory evidence* from citizens like Huffington." *Id.*

21

at 37 ¶ 193 (emphasis added). Count 5 alleges that Cassilly "implemented, enforced, encouraged, and sanctioned a policy of *evidence fabrication and witness coercion* which resulted in the wrongful conviction of citizens like Huffington." *Id.* ¶ 200 (emphasis added).

In Count 10, Huffington alleges intentional infliction of emotional distress under Maryland common law against Saneman, Cassilly, Van Horn, Picha, and Comen. *Id.* at 40. Specifically, Huffington claims that Defendants' "conduct resulting in Plaintiff's wrongful arrest and decades of wrongful incarceration was extreme and outrageous," and "Plaintiff suffered severe emotional distress as a result." *Id.* at 40 ¶¶ 228–29. Finally, Count 11 asserts an "indemnification" claim under Maryland common law against Harford County. *See id.* ¶¶ 232–34.

### A.    Statute of Limitations

An argument common to every Defendant is that Huffington's claims should be dismissed because they are time-barred. *See, e.g.*, ECF 33, at 2 ¶ 4; ECF 34-1, at 19; ECF 35, at 1 ¶ 2. "The raising of the statute of limitations as a bar to plaintiffs' cause of action constitutes an affirmative defense and may be raised by motion pursuant to Fed. R. Civ. P. 12(b)(6), if the time bar is apparent on the face of the complaint." *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005) (first citing *Bethel v. Jendoco Construction Corp.*, 570 F.2d 1168 (3d Cir. 1978); and then citing 2A Moore's Federal Practice § 8.28, at 8–270 (2d ed. 1948)). "The Court must dismiss any claim filed after the statute of limitations period has expired." *Deramus v. Montgomery Cnty. Domestic Rels. Section*, Civ. No. GJH-18-2337, 2019 WL 2395311, at *2 (D. Md. June 5, 2019) (citing *Wenzlaff v. NationsBank*, 940 F. Supp. 889, 890 (D. Md. 1996)).

"The statute of limitations for § 1983 claims is borrowed from the applicable state's statute of limitations for personal-injury actions, even when a plaintiff's particular § 1983 claim does not involve personal injury." *Deramus*, 2019 WL 2395311, at *2 (*Tommy Davis Const., Inc. v. Cape Fear Pub. Util. Auth.*, 807 F.3d 62, 66–67 (4th Cir. 2015)). "In Maryland, the applicable statute

22

of limitations is three years from the date of the occurrence giving rise to the cause of action." *Id.* (quoting Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 5-101). However, "[a]lthough state law determines the applicable statute of limitations for § 1983 claims, federal law governs the date on which that limitations period begins to run." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 388 (4th Cir. 2014). "Federal law, in turn, 'conform[s] . . . to common-law tort principles' for purposes of determining this date." *Id.* (alteration in *Owens*) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace*, 549 U.S. at 388 (cleaned up).

"In *Wallace*, however, the Supreme Court recognized that limitations on common-law torts do not always begin on the date that a plaintiff knows or has reason to know of his injury." *Owens*, 767 F.3d at 389. Thus, "the 'standard rule' does not always control the start of the limitations period for a § 1983 claim." *Id.* "[T]o determine the date of accrual for a particular § 1983 claim, a court must look to the common-law tort that is most analogous to the plaintiff's § 1983 claim and determine the date on which the limitations period for this most analogous tort claim would begin to run." *Id.* "For most common-law torts, a plaintiff's cause of action accrues, and the limitations period commences, when the plaintiff knows or has reason to know of his injury (hence, the 'standard rule')." *Id.* "But if the common law provides a 'distinctive rule' for determining when the limitations period for a particular tort begins to run, a court must 'consider[ ]' this 'refinement' in determining when the limitations period for the plaintiff's analogous claim under § 1983 should commence." *Id.* (quoting *Wallace*, 549 U.S. at 388).

Here, Huffington alleges six kinds of §1983 claims: a due process claim (Count 1), a malicious prosecution claim (Count 2), a false arrest claim (Count 3), *Monell* claims related to the

23

non-disclosure of exculpatory material, evidence fabrication, and witness coercion (Counts 4 and 5), and a civil conspiracy claim (Count 6). The Court addresses each in turn.

### 1.    Huffington's False Arrest (Counts 3 and 7) and False Imprisonment (Count 8) Claims are Time-Barred.

Beginning with Huffington's false arrest and false imprisonment claims, the Supreme Court has explained that "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace*, 549 U.S. at 388. "The running of the statute of limitations on false imprisonment is subject to a distinctive rule—dictated, perhaps, by the reality that the victim may not be able to sue while he is still imprisoned: 'Limitations begin to run against an action for false imprisonment when the alleged false imprisonment ends.'" *Id.* at 389 (quoting 2 H. Wood, Limitation of Actions § 187d(4), p. 878 (rev. 4th ed. 1916)). "Thus, to determine the beginning of the limitations period in this case," the Court "must determine when petitioner's false imprisonment came to an end." *Id.* That is also true with respect to false arrest and imprisonment claims brought under Maryland common law. *See Prince George's Cnty. v. Longtin*, 19 A.3d 859, 874–75 (Md. 2011) ("The general rule for false arrest and imprisonment cases in which a person is arrested and released prior to trial is that 'the statute begins to run only when the imprisonment ends, since the period of imprisonment is treated as a unit.'" (citing 4 Restatement (Second) of Torts § 899, comment c)).

"Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 388 (emphasis in original). "Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process." *Id.* at 390 (emphasis in original)

24

(quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 119, pp. 885–86 (5th ed. 1984)); *see also id.* ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." (citation omitted)).

Accordingly, the statute of limitations period for Huffington's false arrest and false imprisonment claims began to accrue "when legal process was initiated against him." *Id.*; *see also Longtin*, 19 A.3d at 875 ("To be sure, concerns over stale claims should limit applicability of the 'release date' rule in cases in which the plaintiff's imprisonment continues from the arrest to trial and beyond. For example, in a series of cases where the plaintiff has been arrested, held, tried, and convicted, only to be released years later, courts have commenced the statute of limitations at the formal start of criminal proceedings."). That happened long ago, in 1981, when Huffington was indicted and eventually tried and convicted. *See* ECF 16, at 24 ¶ 107, 25 ¶ 112. Consequently, these claims are time-barred.

Huffington, however, seeks to escape this result by arguing that under *Owens*, his claims for false arrest and false imprisonment should be treated identically to his malicious prosecution claims for accrual purposes to avoid "conflicting resolutions." ECF 60, at 18. Specifically, Huffington states that in *Owens*, the "Fourth Circuit found that malicious prosecution was the most analogous claim for the wrongful conviction claims at issue, where those claims also included false imprisonment claims." *Id.* (citing *Owens*, 767 F.3d at 390). Huffington misreads *Owens*. The complaint at issue in *Owens* did not contain any false arrest or false imprisonment claims. *See* Case No. 1:11-cv-03295-GLR, at ECF 1 (D. Md.). Rather, the plaintiff there asserted four § 1983 counts styled as "Due Process/Brady Violation" and "Due Process/Fabrication and Coercion of

25

Perjured Testimony" claims. *See id.*; *see also Owens*, 767 F.3d at 387 ("In his complaint, Owens alleges that the defendants violated his constitutional rights by intentionally and in bad faith withholding exculpatory and impeachment evidence at his 1988 trial."). Indeed, in *Owens*, the parties agreed that "false imprisonment [wa]s not the tort 'most analogous' to Owens's § 1983 claims." *Owens*, 767 F.3d at 390.

False arrest and imprisonment are "entirely distinct" from malicious prosecution and other § 1983 claims, and thus the rules governing when such claims accrue differ. *See id.* As is discussed next, although Huffington rightly recognizes that *some* of his § 1983 claims accrued pursuant to the standard applicable to malicious prosecution claims, the time to bring any false arrest and false imprisonment claims have long since passed. *See Wallace*, 549 U.S. at 390 ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, *but not more*. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." (emphasis added) (citation omitted)). Because it is clear from the face of Huffington's complaint that the statute of limitations has run for purposes of any § 1983 false arrest or imprisonment claim, Counts 3, 7, and 8 of the amended complaint will be dismissed.

   2. <u>Huffington's Due Process (Count 1) and Malicious Prosecution (Counts 2 and 9) Claims are Not Time-Barred.</u>

The Court next evaluates whether Huffington's malicious prosecution and due process claims are time-barred. Count 1 of Huffington's complaint alleges that "fabrications of evidence, witness intimidation and coercion, and concealment and/or suppression of evidence" deprived Huffington "of a fair criminal trial." ECF 16, at 34 ¶¶ 169–70. The Fourth Circuit has observed that for § 1983 claims alleging defendants "violated due process by maintaining proceedings against [the plaintiff] without disclosing exculpatory evidence, malicious prosecution provides the

closest analogy." *Owens*, 767 F.3d at 390. "Malicious prosecution redresses injuries a plaintiff sustains as a result of a defendant's improper initiation or maintenance of formal proceedings against him." *Id.* "Under the common law, the limitations period for a plaintiff's malicious prosecution claim commences when the proceedings brought against him are resolved in his favor." *Id.* (citing Keeton et al. § 119); *see also One Thousand Fleet Ltd. P'ship v. Guerriero*, 694 A.2d 952, 958–59 (Md. 1997) (adopting the view of "Section 674(b) of the Second Restatement of Torts" that "malicious use of process shall lie only when 'the proceedings have terminated in favor of the person against whom they are brought'" (citation omitted)). That is also true of a § 1983 fabrication of evidence claim. *See McDonough v. Smith*, 588 U.S. 109, 124 (2019) ("The statute of limitations for McDonough's § 1983 claim alleging that he was prosecuted using fabricated evidence began to run when the criminal proceedings against him terminated in his favor[.]"); *see also id.* at 115 (assuming that the Second Circuit's treatment of the claim as arising under the Due Process Clause was "sound"). "To satisfy this favorable-termination requirement, a plaintiff must show that the proceedings against him were favorably terminated 'in such manner that [they] cannot be revived.'" *Owens*, 767 F.3d at 390 (alteration in *Owens*) (quoting Keeton et al. § 119). This is true of, for example, an acquittal or entry of a *nolle prosequi*, but "[it] is not true of '[a]ny disposition of the criminal action which does *not* terminate it but permits it to be renewed.'" *Id.* (emphasis in *Owens*) (quoting Keeton et al. at § 119).

"Because the grant of a new trial does not trigger the limitations period for a malicious prosecution claim," Huffington's statute of limitations with respect to Counts 1 and 2 did not begin to run on the date he was granted a new trial—either first on December 6, 1982, or for a second time in May of 2013, based on the new DNA testing in his case. ECF 16, at 26 ¶ 115, 29 ¶ 138. Rather, a "truly final disposition [wa]s achieved" in Huffington's criminal case on November 9,

27

2017, when Huffington entered into an *Alford* plea. *Id.* at 29 ¶ 145. Such a plea constitutes termination of a criminal case, as it does not permit the case to be renewed or revived. *See Owens*, 767 F.3d at 390. However, federal courts, including this Court, have largely held that an *Alford* plea is not a *favorable* termination. *See Daulatzai v. Maryland*, 340 F.R.D. 99, 104 (D. Md. 2021) ("In contrast, courts of appeals and courts in this district that have considered the question have squarely confirmed 'that a conviction based on an *Alford* plea can be used to impose *Heck*'s favorable termination rule.'" (quoting *Ballard v. Burton*, 444 F.3d 391, 397 (5th Cir. 2006)) (collecting cases)).

Huffington attempts to avoid this problem by identifying Governor Hogan's pardon as the point at which a favorable final disposition was achieved in his criminal case. *See* ECF 60, at 13. Defendants argue, however, that the "2023 gubernatorial pardon is an act of executive clemency and does not constitute a judicial finding of innocence that would satisfy the favorable termination requirement." ECF 80, at 8. As an initial matter, the Court agrees with Huffington that a pardon *can* constitute a favorable termination of a conviction for purposes of accrual in some circumstances. *See Savory v. Cannon*, 947 F.3d 409, 417–18 (7th Cir. 2020) (describing the point of accrual for appellant's § 1983 claims as the time at which "the governor of Illinois pardoned him"); *Snyder v. City of Alexandria*, 870 F. Supp. 672, 681 (E.D. Va. 1994) ("By its terms, therefore, Snyder's pardon substantially impugns and discredits his conviction, and therefore qualifies as a favorable termination of the prosecution against him."). But the Fourth Circuit does not appear to have addressed the question of whether and under what circumstances a gubernatorial pardon satisfies the favorable termination requirement. *See Griffin v. Baltimore Police Dep't*, 804 F.3d 692, 698 n.2 (4th Cir. 2015) ("Some courts have held that, while not strictly an 'expungement by executive order,' a pardon still suffices to lift the *Heck* bar. . . . That question is not before us,

and we do not address it."). Fortunately, Judge Ellis faced a similar question with respect to a Virginia gubernatorial pardon. *See Snyder*, 870 F. Supp. at 679. This Court utilizes his learned approach here.

First, as Judge Ellis observed, "[t]here are two reasons for the favorable termination requirement." *Id.* "First, the requirement eliminates the risk of conflict between two simultaneous judicial proceedings." *Id.* (citing Keeton et al. § 119). "If this were the only reason for the termination requirement," Judge Ellis observed, then "all pardons and expungements would qualify as favorable terminations," because pardons necessarily come after a criminal prosecution has concluded. *Id.* But "the favorable termination requirement serves a second, related purpose of ensuring that challenges to the validity of criminal convictions are litigated in proceedings designed for that function, . . . includ[ing] direct appeals and *habeas* petitions, but not civil damages actions." *Id.* (citing *Heck v. Humphrey*, 512 U.S. 477, 485 (1994)). Judge Ellis thus determined that the relevant question was "whether executive pardons . . . are also appropriate means by which a wrongly convicted person can establish his innocence." *Id.* To answer that question with respect to Maryland pardons, an examination of Maryland pardon and expungement law is necessary. *See id.*

"The Governor of Maryland has had the power to grant reprieves and pardons under every version of the Maryland Constitution, dating back to 1776." *Grandison v. State*, 174 A.3d 388, 400 (Md. App. 2017). Currently, Article II, Section 20 of the Constitution of Maryland provides that the governor "shall have power to grant reprieves and pardons, except in cases of impeachment, and in cases, in which he is prohibited by other Articles of this Constitution." Md. Const., art. 20, § 20. The gubernatorial pardon power in Maryland is "broad" and, "except in cases of impeachment and, perhaps, bribery of public officials, there is 'no other provision that limits'"

29

it. *Id.* (internal citation omitted) (quoting Dan Friedman, The Maryland State Constitution 119 (2011)). The Maryland Supreme Court "has recognized that the gubernatorial pardon power encompasses the power to commute a sentence," or stated differently, to "substitute[ ] a lesser penalty for the grantee's offense for the penalty imposed by the court in which the grantee was convicted." *Id.* at 400–01 (citing *Jones v. State*, 233 A.2d 791 (Md. 1967)).

Accordingly, the Maryland "gubernatorial pardon power is plenary." *Id.* at 402. "[I]t does not depend upon a request by the grantee" and the "only substantive limitations on that power are" laid out in Article II itself. *Id.* It follows that the scope and effect of a pardon can be defined by the Governor, so long as any reduced sentence imposed is not itself cruel and unusual punishment or violative of some other constitutional provision. *See id.* at 401. The Correctional Services Article of the Maryland Code categorizes gubernatorial pardon. *See, e.g.*, Md. Code Ann., Corr.. Serv. ("CS") § 7-601(b)(2). Under that Article, a "pardon" is defined generally as "an act of clemency in which the Governor, by order, absolves the grantee from the guilt of the grantee's criminal acts and exempts the grantee from any penalties imposed by law for those criminal acts." *Id.* § 7-101(h). A "partial pardon," on the other hand, means "a pardon that has been limited by the terms of the order granting the pardon to be of less effect than a full pardon." *Id.* § 7-101(k). The Article also defines a "conditional pardon" as "a pardon that is dependent on compliance with conditions precedent or subsequent that the Governor specifies in the written order granting the pardon." *Id.* § 7-101(f).

For purposes of expungement under Maryland law, the Criminal Procedure Article of the Maryland Code provides that "[a] person who has been charged with the commission of a crime . . . may file a petition listing relevant facts for expungement of a police record, court record, or other record maintained by the State or a political subdivision of the State if . . . the person: (i) is

convicted of only one criminal act, and that act is not a crime of violence; and (ii) is granted a full and unconditional pardon by the Governor." Md. Code Ann., Crim. Proc. ("CP") § 10-105(a)(8); *see also id.* § 10-105(c)(4) ("A petition for expungement based on a full and unconditional pardon by the Governor may not be filed later than 10 years after the pardon was signed by the Governor."). Some Defendants argue that nothing in Huffington's complaint or oppositions suggest that he "satisfies the statutory prerequisites for expungement based on a pardon under § 10-105(a)(8)." ECF 80, at 9. "Accordingly, unlike the regimes described in the out-of-circuit cases Plaintiff cites, the pardon did not operate as an expungement, nor did it vacate the conviction by judicial action." *Id.* Saneman argues that "[t]hat distinction matters under *Heck* because Plaintiff still asks this Court to award damages premised on the invalidity of a conviction that has not been set aside by a court." *Id.*

However, the Court disagrees that the precedent Huffington invokes turns on this premise. For example, the Sixth Circuit recently considered whether *Heck*'s holding that "a plaintiff can show her conviction was invalidated by showing it was 'expunged by executive order'" had a literal or figurative meaning. *Carr v. Louisville-Jefferson Cnty.*, 37 F.4th 389, 393 (6th Cir. 2022). The Sixth Circuit agreed with the Eighth Circuit's prior conclusion that the Supreme Court intended the figurative meaning of "expunge" in *Heck*—that literal expungement is not required. *See id.*; *Wilson v. Lawrence Cnty.*, 154 F.3d 757, 760–61 (8th Cir. 1998). For Judge Ellis, too, that distinction was not dispositive. Rather, he concluded that "[a] pardon that, by its terms and circumstances, substantially impugns or discredits a conviction, is a pardon that satisfies the reasons for, and substance of, the favorable termination requirement." *Snyder*, 870 F. Supp. at 680. "These pardons, like not guilty verdicts, merits dismissals, and some decisions not to

31

prosecute, fully serve the purposes for which the favorable termination requirement exists." *Id.* at 681.

This Court agrees with Judge Ellis and other federal courts of appeals to address the issue. Although Huffington's pardon may not be capable of expunging his criminal records in a technical sense, application of the principle elucidated by Judge Ellis to this case leads to the conclusion that the pardon granted to Huffington qualifies as a favorable termination. Governor Hogan issued Huffington "a full pardon" for his convictions.[6] *See* Executive Clemency Pardon for John Norman Huffington (Jan. 13, 2023), https://htv-prod-media.s3.amazonaws.com/files/huffington-1673639577.pdf. Indeed, the Governor's pardon statement recognizes that the Supreme Court of Maryland disbarred Cassilly, "the prosecuting attorney, for prosecutorial misconduct, some of which occurred during these trials." *Id.* "By its terms, therefore," Huffington's "pardon substantially impugns and discredits his conviction and therefore qualifies as a favorable termination of the prosecution against him." *Snyder*, 870 F. Supp. 681. Because it was issued on January 13, 2023, and Huffington filed this lawsuit on July 16, 2025—approximately two years

---

[6] The Court may take judicial notice of Huffington's pardon. *See Armstrong v. United States*, 80 U.S. 154, 156 (1871); *Gilliam v. Allen*, 62 F.4th 829, 839 (4th Cir. 2023) (finding no abuse of discretion where district court took judicial notice of pardon). The complaint also alleges Huffington received a "full innocence pardon" from Governor Hogan on January 13, 2023. ECF 16, at 4 ¶ 10.

and six months later—Huffington's due process[7] and malicious prosecution claims are not time-barred.[8]

### 3. Huffington's *Monell* Claim (Count 4) Is Time-Barred, but His Other *Monell* Claim (Count 5) Will Not Be Dismissed on That Ground.

The State's Attorney for Harford County argues that Huffington's *Monell* claims are barred by the applicable three-year statute of limitations. *See* ECF 42-1, at 6–8. Huffington responds that "[t]he date of Plaintiff's pardon, January 13, 2023, is the correct accrual date" for his *Monell* claims. ECF 63, at 11. As support for that conclusion, Huffington states that "for claims of malicious prosecution, false arrest and false imprisonment, . . . the limitations period accrues when the underlying conviction is invalidated or the proceedings terminate favorably for the plaintiff." *Id.* at 12. But as discussed above, the distinctive accrual rule Huffington references applies only to his malicious prosecution and analogous claims, not to his false arrest and false imprisonment

---

[7] Saneman also argues that Huffington's due process claim should be dismissed because it fails to state a claim. *See* ECF 34-1, at 22–24. However, Saneman characterizes Count I solely as a § 1983 *Brady* claim, which does not capture the fabrication of evidence allegations also present in that count. *See id.* Accordingly, he argues for dismissal of the count because "Huffington's allegations against Saneman consist solely of unsupported claims that he fabricated evidence with Deno Kanaras" and "[t]here are no facts showing that Saneman withheld favorable evidence from Assistant State's Attorney Cassilly or any other prosecutor, much less that any omission affected the outcome of Huffington's trials." ECF 24-1, at 23. But as Saneman admits, Huffington also alleges that Saneman participated in fabricating evidence at a minimum, and the Court is not prepared to say at this stage that such alleged fabrication had no role in Huffington's trials. Accordingly, Count 1 will not be dismissed on this basis.

[8] Defendants' motions to dismiss mostly ignore Huffington's § 1983 civil conspiracy claim, and none discuss the applicable statute of limitations to that claim, despite frequently claiming that "all counts of the complaint . . . are barred by the applicable statute of limitations." *E.g.*, ECF 28-1, at 3. *But see* ECF 37-1, at 15–16. "[B]ecause '[t]he gist of the cause of action is the deprivation and not the conspiracy,'" *Shooting Point, L.L.C. v. Cumming*, 243 F. Supp. 2d 536, 537 (E.D. Va. 2003) (quoting *Lesser v. Braniff Airways, Inc.*, 518 F.2d 538, 540 n. 2 (7th Cir. 1975)), and because Huffington's allegations related to the conspiracy generally track his other § 1983 claims, *see* ECF 16, at 38 ¶¶ 206–10, the Court concludes that Huffington's §1983 civil conspiracy claim survives to the extent that the constitutional deprivation(s) alleged correspond with the other § 1983 claims that are not time-barred.

33

claims. *See supra* Section III.A.1. The parties' dispute thus presents the following question for the Court: when did Huffington's *Monell* claims accrue?

"[A] municipality may not be found liable for a constitutional violation in the absence of an unconstitutional act on the part of at least one individual municipal actor." *Int'l Ground Transp. v. Mayor & City Council of Ocean City*, 475 F.3d 214, 219 (4th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986)). One approach to thinking about the accrual of a *Monell* claim may thus be tied to the accrual of the underlying conduct at issue. But "[a]s a district court in the Southern District of Ohio observed: 'The question of when a *Monell* claim accrues turns out to be a thornier issue than one might imagine.'" *Tilley v. Pierson*, 809 F. Supp. 3d 427, 441 n.8 (S.D. W. Va. 2025) (quoting *Boyer v. Clinton Cnty. Sheriff's Off.*, 645 F. Supp. 3d 815, 823 (S.D. Ohio 2022)). "[C]ourts have divided into two camps. In the first, courts hold that a *Monell* claim accrues when the underlying conduct giving rise to potential *Monell* liability occurred." *Boyer*, 645 F. Supp. 3d at 823 (collecting cases). "In the second camp, courts follow what they often call a 'delayed accrual' theory." *Id.* (collecting cases). "Under this theory, a *Monell* claim does not accrue until a plaintiff is at least on inquiry notice that the conduct the plaintiff experienced is part of some pattern or practice sufficient to give rise to *Monell* liability." *Id.* (collecting cases). "The Fourth Circuit has yet to address this issue head-on." *Tilley*, 809 F. Supp. 3d at 441 n.8. However, it "has previously applied the 'discovery rule' of accrual to § 1983 claims, holding that a plaintiff's cause of action does not accrue until the 'plaintiff knows or has reason to know of the injury.'" *Id.* (quoting *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)). The unsettled nature of this area of the law led Judge Goodwin to conclude in *Tilley* that the time bar was not apparent on the face of the complaint before him. *See id.*

34

The Court is constrained to agree that Count 4 is time-barred under either approach to accrual. Count 4 alleges a *Monell* claim pursuant to § 1983 on the basis that "Cassilly, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy of withholding and/or suppressing material exculpatory evidence from citizens like Huffington." ECF 16, at 37 ¶ 193. Further, Count 4 alleges that "[t]his policy was known as a result of Cassilly's words, deed and due to numerous instances of such misconduct by ASAs *prior to and during* the time of Huffington's prosecution." *Id.* ¶ 194 (emphasis added).

Interpreting those allegations liberally and in favor of Huffington, the Court could conclude that "Huffington's prosecution" continued up to and until November 9, 2017, when Huffington entered his *Alford* plea. *See id.* at 29 ¶ 145. That date, however, would not make Count 4 timely under the applicable three-year statute of limitations. From the face of Huffington's complaint, the last date the Court could reasonably conclude that Huffington learned of any information relevant to Count 4 was in 2021, when the Supreme Court of Maryland resolved Huffington's bar complaint against Cassilly by disbarring him. *See id.* at 5 ¶ 19, at 32 ¶¶ 155–56. Even assuming these claims accrued in 2021, the filing of this suit would be well-beyond the three-year statute of limitations. Accordingly, the Court concludes that Count 4 is time-barred and must be dismissed.

However, Count 5 asserts a *Monell* claim alleging that Cassilly, "in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy of evidence fabrication and witness coercion which resulted in the wrongful conviction of citizens like Huffington." *Id.* ¶ 200. Here, too, the complaint alleges that this policy became "known as a result of Cassilly's words, deeds, and due to numerous instances of such misconduct by ASAs prior to and during the time of Huffington's prosecution." *Id.* ¶ 201. But as the Court described with respect to Huffington's constitutional injuries underlying the *Monell* claim asserted in Count 5,

35

favorable termination governs accrual, which occurred when Huffington received a full pardon in 2023. *See supra* Section III.A.2. Accordingly, the Court will follow the example of Judge Goodwin in concluding that, with respect to Count 5, "the time bar is not apparent on the face of the complaint." *Tilley*, 809 F. Supp. 3d at 441 n.8 (quoting *Ott v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d 655, 658 (4th Cir. 2018)).

### 4. Huffington's Intentional Infliction of Emotional Distress Claim (Count 10) is Time-Barred.

Maryland's general three-year statute of limitations applies to Huffington's intentional infliction of emotional distress ("IIED") claim against Defendants Saneman, Cassilly, Van Horn, Picha, and Comen. *See Kashaka v. Balt. Cnty.*, 450 F. Supp. 2d 610, 616 (D. Md. 2006). Huffington's IIED claim challenges Defendants' "conduct resulting in Plaintiff's wrongful arrest and decades of wrongful incarceration." ECF 16, at 40 ¶ 228. All the conduct which Huffington characterizes as "extreme and outrageous" occurred well over three years before the filing of his complaint. *See generally id.* Further, Huffington has not advanced any argument in opposition that equitable tolling of the statute of limitations applies to his case. *See* ECFs 58–63 (Huffington's responses in opposition to the motions to dismiss). Although it is apparent to the Court that equitable tolling would have some application to this case, it also appears that Huffington had sufficient facts about the harm done such that a reasonable inquiry would have revealed this cause of action at least a decade ago. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996) ("Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." (citation omitted)). Accordingly, the Court concludes that Count 10 is barred by the applicable statute of limitations as to all defendants and must be dismissed.

36

### B. ᾿ Judicial and Collateral Estoppel

Some Defendants also argue that Huffington's § 1983 claims should be dismissed under the doctrines of judicial or collateral estoppel. *See* ECF 34-1, at 24. Saneman, for example, argues that Huffington's § 1983 claims "rest on the premise that he did not commit the murders of Joseph Hudson, Jr. and Diane Becker," and that "premise is directly contradicted by the repeated judicial determinations in his criminal cases." *Id.* Huffington contends that the doctrines are inapplicable because the allegations brought in this suit have never been judicially determined or fully litigated. *See* ECF 60, at 22–24. "When a party attempts to assert a position that is inconsistent with a prior position that the party has successfully asserted in another court, courts have a number of steps that they may take to prevent such an attempted abuse of the judicial process." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996). Judicial estoppel and collateral estoppel are two "closely related" doctrines that may achieve this purpose. *See id.*

"Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Id.* (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 28–29 (4th Cir. 1995)). For the doctrine to apply, "[f]irst, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation." *Id.* at 224. Further, "the position sought to be estopped must be one of fact rather than law or legal theory." *Id.* "Second, the prior inconsistent position must have been accepted by the court." *Id.* "Finally, the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.'" *Id.* (quoting *Tenneco Chemicals, Inc. v. William T. Burnett & Co.*, 691 F.2d 658, 665 (4th Cir. 1982)). Although Saneman asserts that judicial estoppel bars Huffington's claims, he does not suggest that Huffington takes a position now that is inconsistent with on taken in prior litigation—he only argues that "these issues were

37

fully litigated and resolved adversely to him in multiple state and federal proceedings." ECF 34-1, at 25. Unquestionably absent is any allegation or evidence that Huffington intentionally misled the court to gain an advantage. And, as Huffington repeatedly asserts, he "has always maintained his innocence (including through his *Alford* plea)." ECF 60, at 22; *cf. Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996) ("Lowery's present position regarding the circumstances of the shooting is contradictory to the position he took when he pled guilty. . . . Lowery's argument, however, is undercut by the plain language in his statement accompanying his guilty plea . . . ."). The Court thus agrees with Huffington that judicial estoppel is not applicable here.

Saneman's arguments sound more in collateral estoppel. "A party seeking to rely on the doctrine of collateral estoppel is obliged to establish five elements: (1) that 'the issue sought to be precluded is identical to one previously litigated'"; (2) "that the issue was actually determined in the prior proceeding"; (3) "that the issue's determination was 'a critical and necessary part of the decision in the prior proceeding'"; (4) "that the prior judgment is final and valid"; and (5) "that the party against whom collateral estoppel is asserted 'had a full and fair opportunity to litigate the issue in the previous forum.'" *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006) (quoting *Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998)). Saneman argues that each of Huffington's claims, "whether for false imprisonment, malicious prosecution, or violation of due process," "necessarily assumes that he was wrongfully convicted." ECF 34-1, at 24–25. Yet, Saneman contends, "these issues were fully litigated and resolved adversely to him" in prior cases, pointing to a decision of the Fourth Circuit among other cases. *See id.* at 23–25; *Huffington v. Nuth*, 140 F.3d 572 (4th Cir. 1998).

Huffington rightly points out that he "did not litigate Saneman's misconduct in his underlying criminal matter and certainly was not given a fair opportunity to be heard on issues of

38

fabrication and suppression." ECF 60, at 23. For example, in 1998, the Fourth Circuit affirmed the district court's denial of Huffington's petition for a writ of habeas corpus. *Huffington*, 140 F.3d at 575. In his habeas petition, Huffington "principally contend[ed] that his trial attorney rendered ineffective assistance of counsel." *Id.* at 578. The Fourth Circuit held, however, that the performance of Huffington's counsel "did not fall below an objective standard of reasonableness" and thus the court's "confidence in the outcome of the trial remain[ed] undisturbed." *Id.* at 580–83. The Fourth Circuit also rejected Huffington's other challenges to the state court's refusal to admit certain evidence at his trial and to Maryland's system of discretionary appeals for claims of ineffective assistance of counsel. *See id.* at 583–85. The issues addressed by the Fourth Circuit and other courts in Huffington's post-conviction litigation over the last several decades were particularized to that context, and they differ greatly from the issues presented in this suit.

Saneman argues that "courts routinely bar § 1983 claims that would require relitigating the underlying criminal conviction or would imply the invalidity of a conviction not previously overturned." ECF 34-1, at 24–25 (citing *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994); *Holsey v. Bass*, 519 F. Supp. 395, 415 (D. Md. 1981)). The only case Saneman cites to exemplify the application of this proposition, however, is unpersuasive. In *Holsey v. Bass*, this Court concluded that "[a]fter direct appeals, three state post conviction proceedings, six federal habeas petitions, and numerous civil rights suits, it [was] inconceivable that there remains an issue which has not yet been fully explored or waived" with respect to the plaintiff's conviction. 519 F. Supp. at 415. In contrast, this appears to be Huffington's first civil rights suits related to his conviction. *See* ECF 60, at 23–24. Huffington suggests that the Fourth Circuit decision in *Washington v. Pellegrini* is more instructive here, and the Court agrees. 125 F.4th 118 (4th Cir. 2025).

39

There, the Fourth Circuit explained that "applying collateral estoppel to prohibit [a plaintiff] from litigating the alleged misconduct that led to his now vacated convictions is incompatible with the equitable principles that underlie the doctrine." *Id.* at 121. To be sure, "[t]he doctrines of res judicata and collateral estoppel apply to § 1983 actions, and federal courts must afford preclusive effect to issues which have been decided by state courts when the courts of that state would do so." *Id.* at 127 (alteration in original) (quoting *Gilliam v. Sealey*, 932 F.3d 216, 231 (4th Cir. 2019)). But where collateral estoppel would preclude a plaintiff "from taking even a single bite of the apple regarding" the "alleged misconduct," the Fourth Circuit rejected its application. *See id.* at 129–30. That is especially true where a defendant invokes "non-mutual, defensive collateral estoppel, meaning that they are relying on a prior ruling they were not party to, as an affirmative defense in their own case." *Id.* at 129. So too here. The claims Huffington brings have "never been litigated in a civil case" before this one. *Id.* The Court declines to apply the doctrine of collateral estoppel here.

## C.    Qualified Immunity

Several Defendants argue that they are entitled to qualified immunity at this stage of litigation. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). When assessing a claim of entitlement to qualified immunity, courts apply a two-part test. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Under the first prong, courts determine "whether a constitutional right would have been violated on the facts alleged," and under the second prong, whether that constitutional right was clearly established. *Saucier*, 533 U.S. at 200. As to the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable

40

official would understand that what he is doing violates the law."[9] *Id.* at 202. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Though often fashioned as a test in two parts, the Court may consider either prong of the test first. *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *see also Pearson*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). "The official is entitled to qualified immunity if either prong is not satisfied." *Jones v. Solomon*, 90 F.4th 198, 207 (4th Cir. 2024) (quoting *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019)).

"[B]ecause '[t]he entitlement is an immunity from suit rather than a mere defense to liability,'" the Supreme Court has "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). However, "[q]ualified immunity defenses are 'usually not successful' at this early stage in the proceedings, where plaintiffs must present only 'a claim that is *plausible* on its face.'" *Riddick v. Barber*, 109 F.4th 639, 650 n.5 (4th Cir. 2024). "Instead, qualified immunity typically is best addressed 'at the summary judgment stage after the facts have been developed through discovery.'" *Id.* (quoting *Alford v. Cumberland Cnty.*, No. 06-1569, 2007 WL 2985297, at *3 (4th Cir. Oct. 15, 2007)); *see also Owens*, 767 F.3d at 396 ("A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but, as the Second Circuit has noted, when asserted at this early stage in the proceedings, 'the defense faces a

---

[9] "In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).

41

formidable hurdle' and 'is usually not successful.'" (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)). The Court addresses the Defendants' arguments for qualified immunity, assessing whether the issue is suitable for decision now as to each.

### 1. Saneman

Saneman argues that Huffington's complaint "asserts in conclusory fashion that Saneman and other investigators 'prepared or assisted' a key witness, Joseph Kanaras, in making 'false statements,'" but "fails to identify what those supposed fabrications were or how they violated any clearly established constitutional right." ECF 34-1, at 16. According to Saneman, "[a]t most, Plaintiff faults Saneman for not conducting a perfect investigation, and allegedly giving deference to [Deno] Kanaras– who cooperated with law enforcement, led investigators to evidence, and was ultimately found guilty for his connection in the murders of Hudson and Becker." *Id.* Huffington disagrees, arguing that he "has alleged in detail that [ ] Saneman knowingly fabricated evidence against Plaintiff and suppressed material exculpatory evidence from Plaintiff." ECF 60, at 14. The Court agrees with Huffington.

The Fourth Circuit has "concluded that police officers' suppression of evidence also violates the Constitution," just as a prosecutors' does. *Owens*, 767 F.3d at 396 (citing *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964)). Relatedly, the Fourth Circuit has held that there is a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000)); *see also Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) ("We have recognized a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." (citation modified)). "'Fabricated evidence' may include false testimony." *Billinger v. Min*, Civ. No. RDB-25-0230, 2026 WL 850444, at *8–9 (D. Md. Mar.

27, 2026) (citing *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 282–83 (D. Md. 2020));
*see also Thomas v. Balt. Police Dep't*, Civ. No. BAH-23-3379, 2025 WL 81950, at *8 (D. Md.
Jan. 10, 2025) (citing *Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019)). "Demonstration of a
violation of [the] constitutional right requires, in this context, proof that [Saneman] fabricated
evidence and that the fabrication resulted in a deprivation of [Huffington]'s liberty." *Washington*,
407 F.3d at 282 (citing *Zahrey*, 221 F.3d at 349). At the motion to dismiss stage, however, the
Court need only determine whether Huffington's allegations paint a plausible picture of the
requisite demonstration. *See Iqbal*, 556 U.S. at 678.

Huffington has done so. The complaint alleges that Saneman (along with Van Horn,
Comen, and Cassilly) fabricated false evidence against Huffington, primarily through the
testimony of Deno Kanaras. *See, e.g.*, ECF 16, at 15–16 ¶ 72. Huffington has identified particular
evidence he accuses Saneman of fabricating, including by alleging that Saneman fabricated initial
and additional details for Kanaras' testimony as the investigation evolved to supplement or fix
inconsistencies and omissions. *See, e.g.*, *id.* at 15–16 ¶¶ 69–72, at 20–21 ¶ 89–91; *McPherson*,
494 F. Supp. 3d at 282 (finding fabrication of evidence claim survived dismissal where complaint
alleged witness told officers that plaintiffs had no involvement in the murder, but the officers said
"[the witness] was wrong and insisted he give a different answer, after feeding him information
[the officers] wanted him to say"). Huffington also alleges that Saneman gave Deno time to
discard evidence of the crimes, including by cleaning his car. *See id.* at 11–12 ¶¶ 53–58.
Moreover, Huffington plausibly alleges that these events were casually connected to his ultimate
conviction and subsequent incarceration for the murders. *See, e.g.*, *id.* at 26 ¶ 117 ("The case was
again tried largely on Deno's testimony."); *Massey*, 759 F.3d at 354 (noting that "[f]abrication of
evidence alone is insufficient to state a claim for a due process violation" and that "a plaintiff must

43

plead adequate facts to establish that" fabrication was both the but-for and proximate cause of "his conviction and subsequent incarceration"). Accepting all allegations as true and taking all inferences flowing therefrom in the light most favorable to Huffington, as the Court must, Huffington has alleged a plausible violation of clearly established law.

### 2. Picha

Picha also argues that qualified immunity shields him from suit. ECF 37-1, at 9–10. Picha contends that no conduct alleged by Huffington was "unlawful, much less 'clearly established.'" *Id.* at 9. The Court agrees with Picha that qualified immunity is appropriate to apply at this stage of litigation as to him alone. The factual allegations in the amended complaint allege Picha's involvement at only a few points. First, Huffington alleges that Hudson's close friend phoned Picha to inform him about "Phillip," the drug supplier he then believed killed Hudson. ECF 16, at 10 ¶ 45. The amended complaint does not allege what Picha did (or did not do) with this information. Picha is next mentioned in relation to his involvement in taking custody of certain evidence, including the vodka bottle Deno directed Saneman to; the knife, sheath, gun, and holster Saneman originally collected; and clothing from Deno's attorney at the attorney's law office and at the Kanaras residence. *Id.* at 18–19 ¶ 84, at 22 ¶¶ 98–99, at 22–23 ¶ 100. Picha is also alleged to have "advised an officer 'of the situation of the Kanaras' (sic) possibly being in danger," resulting in cars patrolling the Kanaras residence. *Id.* at 23 ¶ 101.

Although there is a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity," *Washington*, 407 F.3d at 282 (citation omitted), the limited factual allegations in the complaint do not give rise to a plausible inference that Picha fabricated evidence, or even that Picha's actions related to the collection of evidence were causally connected to Huffington's conviction. *See Massey*, 759 F.3d at 354. Huffington does not actually allege that Picha fabricated any piece of evidence, only that

44

he played a role in transporting or accepting certain evidence at the direction of other individuals. *See* ECF 16, at 18–19 ¶ 84, at 22 ¶¶ 98–99, at 22–23 ¶ 100–01. Moreover, even if the complaint alleged that Picha had failed to investigate the lead provided to him by Hudson's friend shortly after the murder, *see id.* at 10 ¶ 45, such inaction does not violate due process. *See Tarlton for McCollum v. Sealey*, No. 5:15-CV-451-BO, 2018 WL 1129976, at *10 (E.D.N.C. Mar. 1, 2018) ("However, the failure to investigate other leads, if determined to be negligent or even grossly negligent, does not violate due process." (citing *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 955 (8th Cir. 2001)), *aff'd sub nom. Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019). Because Huffington has not adequately alleged that Picha violated clearly established law, Picha will be dismissed as a defendant in this action.

### D.    Prosecutorial Immunity

Huffington sues two former prosecutors in his amended complaint: Cassilly, the Harford County State's Attorney during the relevant period, and Comen, an Assistant Harford County State's Attorney. *See* ECF 16, at 5 ¶ 19, at 6 ¶ 23. Both Defendants argue that this suit is barred by prosecutorial immunity.[10] *See, e.g.*, ECF 28-1, at 5–6. The Supreme Court has held that prosecutors are absolutely immune from damages liability when they act as advocates for the State. *See Imbler v. Pachtman*, 424 U.S. 409, 430–32, (1976). "That decision rests on an 'important public policy' justification." *Savage v. Maryland*, 896 F.3d 260, 268 (4th Cir. 2018) (quoting *Carter v. Burch*, 34 F.3d 257, 261 (4th Cir. 1994)). "The public trust of the prosecutor's office would suffer were the prosecutor to have in mind his own potential damages liability when making

---

[10] In his two-page motion to dismiss, Cassilly argues that "Huffington's claims are barred by immunity and qualified immunity." ECF 35-1, at 1 ¶ 4. Cassilly purports to incorporate the substance of Harford County's and Saneman's motions to dismiss in lieu of detailing the arguments in his motion. *Id.* ¶ 1. Little to no ink is devoted to the phrase "prosecutorial immunity" in those motions, let alone its application to Cassilly in particular. *See* ECF 79, at 11.

prosecutorial decisions—as he might well were he subject to § 1983 liability." *Id.* (internal quotation marks omitted) (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 341–42 (2009)). Although this immunity leaves those "'genuinely wronged' without a remedy against prosecutors acting for malicious or unlawful purposes," the Supreme Court has concluded that "the importance of shielding prosecutorial decision-making from the influence of personal liability concerns . . . outweigh[s] that harm." *Id.* (first quoting *Imbler*, 424 U.S. at 427; then citing *Carter*, 34 F.3d at 261).

"Given these costs, however, the Court has been careful to limit the scope of a prosecutor's absolute immunity." *Id.* "Because prosecutorial immunity 'safeguards the process, not the person,' it applies only to conduct that is 'intimately associated with the judicial phase of the criminal process.'" *Id.* (internal quotation marks omitted) (quoting *Nero v. Mosby*, 890 F.3d 106, 117–18 (4th Cir. 2018)). "In deciding whether an action meets that standard," the Court applies "a 'functional approach,' looking to 'the nature of the function performed,' without regard to 'the identity of the actor who performed it.'" *Id.* (internal quotation marks omitted) (quoting *Nero*, 890 F.3d at 118). The focus should remain "on the 'conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful.'" *Id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993)).

"In applying this functional approach, the Supreme Court has distinguished between advocative functions and investigative or administrative functions, holding that the former enjoy absolute immunity but the latter do not." *Nero*, 890 F.3d at 118 (citing *Kalina v. Fletcher*, 522 U.S. 118, 125–26 (1997)). "A prosecutor acts as an advocate when she professionally evaluates evidence assembled by the police, decides to seek an arrest warrant, prepares and files charging documents, participates in a probable cause hearing, and presents evidence at trial." *Id.* (internal

46

citations omitted). "In contrast, a prosecutor does not act as an advocate, but rather in an investigative or administrative capacity, when she gives legal advice to police during an investigation, investigates a case before a probable cause determination, and personally attests to the truth of averments in a statement of probable cause." *Id.* (internal citations omitted). With those background principles in mind, the Court evaluates whether Cassilly and Comen enjoy absolute immunity from this suit.

### 1. Cassilly

As an initial matter, Huffington argues that Cassilly's arguments are not properly before the Court because his "motion consists of an incorporation by reference of the arguments made in the motions to dismiss filed by Harford County . . . and David Saneman." ECF 61, at 16. Huffington further points out that Cassilly's motion "does not explain how th[e] arguments" in the referenced motions apply to Cassilly's conduct, nor does Cassilly's motion even specify the type of absolute immunity he invokes. *Id.* at 16–17. To be sure, "the Court bears no responsibility to flesh out an unexplained argument on a party's behalf." *Gibson v. Maryland Motor Vehicle Admin.*, Civ. No. 20-3220-BAH, 2024 WL 51132, at *9 n.15 (D. Md. Jan. 4, 2024) (collecting cases). However, even in instances where a party presents "imprecise and vague" arguments, this Court often construes such arguments as best it can. *Id.* And it is plain to the Court here that Cassilly's motion seeks to invoke prosecutorial immunity.

The Court thus turns to whether Cassilly's conduct falls under the ambit of that absolute immunity. Huffington argues that he "has alleged Cassilly's specific investigatory conduct" in the first amended complaint. ECF 61, at 19 (citing ECF 16, at 14 ¶¶ 65–66, at 15–16 ¶¶ 72–73). However, Huffington goes on to describe the investigation undertaken by Comen, Saneman, and Van Horn, specifically their interview with Deno Kanaras. *See id.* Huffington's argument, like the complaint itself, rests on "Cassilly's likely attendance" at meeting(s) between Saneman, Van

47

Horn, and Comen, during which time Huffington alleges that Deno's testimony was fabricated. *See id.* The amended complaint specifically alleges that Cassilly was involved in the fabrication or, "at a minimum, was aware that his partner, Comen, was preparing Deno's statement to falsely implicate" Huffington. ECF 16, at 14 ¶ 66; *see also id.* at 16 ¶ 73 ("Cassilly participated in and/or was aware of investigators' knowing preparation of false statements."). Huffington further points out that these events occurred "before Plaintiff had been arrested or charged," ECF 61, at 20 (citing ECF 16, at 17 ¶ 78), and he situates Cassilly's conduct in this case against the backdrop of the alleged "practice of the Harford County State's Attorney's office at the time, in which Cassilly took on investigative responsibilities in high-profile cases like this one," *id.* (citing ECF 16, at 14 ¶ 67).

Huffington argues that Cassilly's conduct closely parallels that of the prosecutors in *Buckley v. Fitzsimmons*, who the Supreme Court concluded were engaged in an investigative function and thus did not have absolute immunity from suit. 509 U.S. at 274. There, the prosecutors "were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot." *Id.* Importantly, the prosecutors there did "not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during" the period of their investigatory conduct, prior to convening a special grand jury. *Id.* "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* In this case, there is no such concession. However, the Supreme Court has specified that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Id.* at 274 n.5. "Even after that determination, . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.*

To the extent that Cassilly engaged in fabricating Deno's testimony, the Court agrees that Cassilly was engaged in an investigative function to which only qualified, not absolute, immunity may attach. *See Buckley*, 509 U.S. at 275 ("Respondents have not cited any authority that supports an argument that a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime was immune from liability at common law, either in 1871 or at any date before the enactment of § 1983. It therefore remains protected only by qualified immunity."); *see also Annappareddy v. Pascale*, 996 F.3d 120, 139 (4th Cir. 2021) ("In applying this functional approach, the timing of a prosecutor's conduct is a key factor. . . . [A]ctions taken before probable cause is established are more likely to be 'investigative' in nature – the same kind of function normally performed by detectives or police officers – and therefore protected only by qualified immunity."). "When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same," *id.* at 276, and to the extent Cassilly was involved in allegedly fabricating a statement provided by Deno prior to bringing charges against Huffington, he was engaged in the role of detective. And, for the same reasons articulated above, the Court cannot conclude at this stage of litigation that Huffington has failed to allege a plausible violation of clearly established law by Cassilly.

2. Comen

The Court reaches the same conclusion with respect to Comen's alleged participation in the investigation that occurred prior to Huffington's arrest in the matter. Huffington alleges that Comen, alongside deputy sheriffs Saneman and Van Horn, fabricated evidence and details of Huffington's involvement in the murders throughout their interrogation of Deno Kanaras. *See* ECF 16, at 14 ¶¶ 65–66, at 15–17 ¶¶ 72–78. The Court agrees with Huffington that "Comen's conduct in this respect was no different than any police officer interviewing a witness to investigate and build a case" in function, setting aside its lawfulness. ECF 58, at 7. Because prosecutors do

not enjoy absolute immunity from fabrication of false evidence during the preliminary investigation of an unsolved crime, *see Buckley*, 509 U.S. at 275, Comen is not absolutely immune from due process (Count 1) or civil conspiracy (Count 6) claims of the amended complaint insofar as those claims turn on Comen's alleged fabrication of evidence. Further, the Court will not apply qualified immunity at this stage of litigation for the reasons previously explained. *See supra* Section III.C.

### 3. Malicious Prosecution, False Arrest, and False Imprisonment

However, to the extent Huffington seeks to bring § 1983 and state law malicious prosecution and false arrest and imprisonment claims against Cassilly and Comen, such claims must fail. *See Annappareddy*, 996 F.3d at 138 ("Maryland has adopted the federal doctrine of absolute prosecutorial immunity."). As the Supreme Court has explained, "[t]he reason" the Court grants absolute immunity for "malicious prosecution[] is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not." *Buckley*, 509 U.S. at 274 n.5. "At bottom," Huffington's malicious prosecution and false arrest and imprisonment claims "take issue with [Cassilly and Comen]'s decision to prosecute" Huffington, resulting in Huffington's imprisonment. *See, e.g.*, ECF 16, at 39 ¶ 222 (alleging that Cassilly "caused the commencement or continuation of an original criminal proceeding against Plaintiff when there was no probable cause to do so"). Accordingly, those claims (Counts 2, 7, 8, and 9) as asserted against Cassilly and Comen must be dismissed.

### E. Harford County (Counts 5 and 11)

Huffington asserts a single count against Harford County (Count 11) for indemnification under Maryland common law. *See* ECF 16, at 40 ¶¶ 232–34. In response, Harford County argues that the State's Attorney and Assistant State's Attorneys, along with county sheriffs and deputy sheriffs, are State officers, not County officers, and thus are officials and employees for which the

State bears legal and financial responsibility. *See* ECF 33-1, at 14–28. Huffington contends that Harford County's arguments are misplaced, because "Plaintiff's sole claim against the County is for *indemnification*, not for vicarious/*respondeat superior* or policymaker liability that would necessarily require an employment or policymaker relationship between the State's Attorney/Sheriff defendants and the County." ECF 59, at 6 (emphasis in original). "To the contrary," Huffington argues that "Maryland state law places financial responsibility for the type of judgment Plaintiff seeks against the State's Attorney and Sheriff's Office defendants on Harford County, *irrespective* of the precise nature of the relationship between those offices and the County." *Id.* (emphasis in original). Harford County strongly refutes that assertion. *See generally* ECF 79. The Court addresses each category of defendants in turn as it evaluates the viability of Huffington's indemnification claim against Harford County.

### 1. State's Attorney and Assistant State's Attorneys

The Maryland Local Government Tort Claims Act ("LGTCA") "limits the civil liability of local governments and their employees." *Johnson v. Baltimore Police Dep't*, Civ. No. ELH-19-00698, 2020 WL 1169739, at *37 (D. Md. Mar. 10, 2020) (citing Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 5-301 et seq.). "Under the LGTCA, 'a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.'" *Id.* (quoting *Johnson v. Francis*, 197 A.3d 582, 594 (Md. App. 2018)). "Thus, 'an entity that is designated a local government under the LGTCA, and has available the common law defense of governmental or sovereign immunity, can no longer raise that defense to escape the statutorily imposed duties to defend and indemnify.'" *Id.* (quoting *Baltimore Police Dep't v. Cherkes*, 780 A.2d 410, 434 (Md. App. 2001)).

51

To be sure, Harford County is a local government under the LGTCA. See CJP § 5-301(d)(1)–(2) (defining "local government" as both a charter and code county as defined in § 1-101 of the Local Government Article). Under the LGTCA, an "'employee' means any person who was employed by a local government at the time of the act or omission giving rise to potential liability against that person." CJP § 5-301(c)(1). However, "the State's Attorney is a state official, not a local government employee." *Brown v. Mayor & City Council of Baltimore City*, Civ. No. GLR-23-155, 2024 WL 2212911, at *5 (D. Md. May 16, 2024) (citing Md. Code Ann., Gen. Prov. § 5-101(ll)(5) ("'State official' means . . . a State's Attorney . . . .")). On the contrary, "[t]he Maryland legislature sets the pay for each State's Attorney and prescribes the duties of the State's Attorney." *Runnels v. Newell*, 944 A.2d 1183, 1213 (Md. App. 2008) (citing Md. Const., art. V, § 9), *aff'd in part and rev'd in part on other grounds*, 967 A.2d 729 (Md. 2009). Moreover, "[n]o Maryland statute describes a State's Attorney as a county official or delegates to the State's Attorney any administrative power on behalf of a county." *Id.* Rather, the Maryland Tort Claims Act ("MTCA") defines "a State's Attorney of a county . . . or an employee of an office of a State's Attorney" as "State personnel." Md. Code Ann., State Gov't ("SG") § 12-101(a)(8).

Huffington points out that "Maryland law provides generally that a county is responsible for the 'expenses as provided by law and the current practice of the county.'" ECF 59, at 9 (quoting CP § 15-401(a)). And "[s]pecifically with respect to Harford County, Maryland law provides that '[t]he county government shall pay all reasonable expenses for the conduct of the office.'" *Id.* (alteration in original) (quoting CP § 15-413). Huffington contends that "[w]hile the Maryland Tort Claims Act enables individuals to sue the state of Maryland in state court for certain acts of the State's Attorney and its employees, no provision of the MTCA usurps the County's obligation to pay all other expenses of the office, including non-MTCA judgments," so according to

52

Huffington "the County has an indemnification obligation for Plaintiff's claims against the Harford County State's Attorney." *Id.* at 9–10 (internal citations omitted).

However, CP § 15-401(a) is incapable of supporting the weight Huffington places on it. As Harford County points out, CP § 15-401(a) makes a county responsible for paying out the salaries along with the "office, travel, and other expenses" of its State's Attorney's Office and its employees. *See* CP § 15-401(a)(1) ("The State's Attorney for a county shall receive: (i) an annual salary for performing the duties of the office as set forth in the public general laws and the public local laws of the county; and (ii) an annual payment for office, travel, and other expenses as provided by law and the current practice of the county."). "[W]here the general words in a statute . . . follow the designation of particular things or classes of subjects, . . . the general words in the statute will usually be construed to include only those things of the same class or general nature as those specifically antecedently mentioned." *Tribbitt v. State*, 943 A.2d 1260, 1271 (Md. 2008) (alteration in original) (quoting *State v. Sinclair*, 337 A.2d 703, 711 (Md. 1975)). This rule of statutory construction is known as *ejusdem generis*. *See id.* Here, that canon's application informs the interpretation of the phrase "other expenses" following the enumeration of specific kinds of expenses, such as "office" and "travel." *See* CP § 15-401(a)(1). Those specific words suggest expenses associated with the State's Attorney's Office related to its daily functioning. To interpret the phrase "other expenses" to include the (potentially sizeable) obligation of legal judgments of the office's employees would subvert the statute's obvious purpose. Accordingly, the Court concludes that the indemnification count asserted against Hartford County related to the actions of the Harford County State's Attorney or Assistant State's Attorneys cannot progress.

For the same reason, Huffington's remaining *Monell* claim (Count 5) must fail at this stage. "[A] municipality is subject to Section 1983 liability only when its 'policy or custom, whether

made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury[.]'" *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 470 (4th Cir. 2013) (second alteration in original) (quoting *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978)). "The requirement that the allegedly unconstitutional act stems from an established municipal policy or the actions of a final policymaker ensures that the municipality is 'responsible' for the alleged violations of a plaintiff's constitutional rights." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (quoting *Pembaur*, 475 U.S. at 483). Although state law may not always "speak with perfect clarity," courts can expect that "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 125.

Huffington alleges that "[a]s the top policymaker for the SAO, Joseph Ignatius Cassilly, in violation of Plaintiff's constitutional rights, implemented, enforced, encouraged, and sanctioned a policy of evidence fabrication and witness coercion which resulted in the wrongful conviction of citizens like Huffington." ECF 16, at 37 ¶ 200. But as just discussed, Cassilly is not a municipal employee, and the SAO is not a municipal institution. For this reason, the claim is not even asserted against the correct Defendant (i.e., Harford County), but rather against a State entity ("Defendant Cassilly in his official capacity," or the State's Attorney for Harford County). *See id.* at 37. But even if Huffington had asserted this claim against the municipality, Maryland law governing the SAO indicates that any policy emanating from it is State policy, not county policy. *See supra*; ECF 33-1, at 22–23. Consequently, Huffington's complaint fails to allege "an

54

established *municipal* policy or the actions of a final policymaker" of the municipality that would "ensure[] that the *municipality* is 'responsible' for the alleged violations of [the] plaintiff's constitutional rights." *Santos*, 725 F.3d at 470 (emphasis added) (citation omitted); *see also Lytle v. Brewer*, 77 F. Supp. 2d 730, 743 (E.D. Va. 1999) (dismissing a Monell claim because the official capacity claim was brought against an individual who was "not an official policy maker, or final decision maker for the City of Norfolk"). Count 5 must be dismissed.

### 2.    Sheriff's Deputies

The same conclusion follows as to the Harford County Sheriff's deputies, although for somewhat different reasons. The Supreme Court of Maryland has held that "as a matter of Maryland law, the Sheriff and Deputy Sheriffs of Harford County are officials and/or employees of the State of Maryland rather than of Harford County." *Rucker v. Harford Cnty.*, 558 A.2d 399, 402 (Md. 1989). "The role of a sheriff as a State constitutional officer whose duties are subject to control by the General Assembly" led that court "to the conclusion that sheriffs are State rather than local government employees." *Id.* Moreover, "[b]ecause a deputy sheriff functions as the alter ego of the sheriff, and exercises the same authority," the court "reach[ed] the same conclusion with respect to deputy sheriffs." *Id.*

In that same case, the Supreme Court of Maryland went on to address whether, under Maryland law, "Harford County or the State of Maryland is obligated to fund the expenses associated with claims for liability involving the Harford County Sheriff, the Deputy sheriffs or the Sheriff's Office, including the cost of liability insurance, the costs of defending suits brought against them and the payment of any settlements and judgments." *Id.* at 407. That court rightly observed that "[t]he General Assembly *could*, of course, by statute make counties or municipalities liable for the tortious acts of State employees." *Id.* (emphasis added). But it concluded that under the LGTCA, by expressly including certain State agencies and employees, "the Legislature

implicitly excluded other State entities and officials such as sheriffs and deputies." *Id.* at 408. Accordingly, the Supreme Court of Maryland concluded that "under Maryland law, Harford County is generally not obliged to fund any of the expenses associated with tort liability claims against the Harford County Sheriff, Deputy Sheriffs, or the Sheriff's Office." *Id.* at 409.

Shortly after the Supreme Court of Maryland's decision in *Rucker*, however, the Maryland General Assembly amended the MTCA to clarify that the county Sheriff and the Sheriff's deputies are "State personnel." *See* SG § 12-101(a)(6). The Maryland General Assembly also passed § 9-108 of the State Finance and Procurement Article ("SFP") of the Maryland Code, "a provision regarding coverage and defense costs of sheriffs and deputy sheriffs." *J.A. v. Abreu*, No. 1:23-CV-02922-JRR, 2024 WL 3638023, at *4 (D. Md. Aug. 2, 2024). The provision provides in relevant part that for a sheriff or deputy sheriff engaged in "activities relating to performing law enforcement functions" that do not arise under "a multijurisdictional agreement under the supervision and direction of the Maryland State Police or other State agency," "[a] county . . . may obtain insurance to provide the coverage and defense necessary under the Maryland Tort Claims Act." SFP § 9-108(a)(3), (b)(5), (c). Moreover, "[i]f a county . . . does not obtain adequate insurance coverage to satisfy the coverage and defense necessary under the Maryland Tort Claims Act, an assessment for coverage and for payment of any litigation expenses, other than for compensation for the time spent by any State employee working for the Attorney General, shall be set off from" other revenue streams. *Id.* § 9-108(d); *Harrison v. Berry*, Civ. No. 25-2958-TDC, 2026 WL 1354412, at *5 (D. Md. May 14, 2026) ("Section 9-108 provides that if a county lacks adequate insurance coverage to satisfy a judgment and pay the expenses of a defense in relation to a [MTCA] claim against a sheriff or deputy sheriff, the state will offset the amount the county

owes from state funds appropriated to the county, or from the county's share of the state income tax.").

Huffington argues that "[b]y passing Section 9-108, the legislature reoriented financial responsibility for judgments against Sheriffs and deputies to render the County responsible for torts committed while those individuals engaged in law enforcement functions." ECF 59, at 7. Moreover, he points to at least one case before this Court in which Harford County "accepted tender of coverage and defense" of an action pursuant to § 9-108 brought against the Sheriff and his deputies. *See Ledergerber v. Blubaugh*, Civ. No. JKB-20-1208, 2020 WL 7029868, at *11 (D. Md. Nov. 30, 2020); ECF 59, at 8. Although § 9-108 clearly authorizes Harford County to "provide the coverage and defense necessary under the Maryland Tort Claims Act" for the Sheriff and deputy Sheriffs in Harford County, it does not *require* Harford County to do so. This is evidenced by the statute's use of the word "may" as opposed to "shall." SFP § 9-108(c) ("A county or Baltimore City *may* obtain insurance to provide the coverage and defense necessary under the Maryland Tort Claims Act." (emphasis added)); *Bethesda Afr. Cemetery Coal. v. Hous. Opportunities Comm'n of Montgomery Cnty.*, 322 A.3d 681, 717 (Md. 2024) ("Generally, . . . the word 'may' in a statute 'connotes permission or authorization[,]' whereas 'the term "shall" in a statute indicates the legislative intent that the statute be mandatory.'" (citation omitted)). If the County fails to do that, however, the statute expressly provides for an alternative route for "an assessment for coverage and for payment of any litigation expenses." SFP § 9-108(d).

This mechanism for coverage may ultimately prove to have some application to this case, but the Court sees no reason why an indemnification count asserted by Huffington is the appropriate means by which to employ it. Indeed, in *Ledergerber v. Blubaugh*, the case Huffington invokes for support, Judge Bredar ultimately dismissed Harford County as a party defendant but

57

noted that "this decision does not in any way affect Harford County's obligations in relation to defense and coverage under Md. Code Ann., State Fin. & Proc. § 9-108." 2020 WL 7029868, at *5. The Court here will take the same course. The single indemnification count against Harford County will be dismissed, thus dismissing Harford County as a defendant in this action. This dismissal has no effect on any of Harford County's obligations under § 9-108, nor do "the existence of [any] such obligations . . . render Harford County subject to direct liability under the theories alleged" in this case. *See Ledergerber*, 2020 WL 7029868, at *5.

## IV.   CONCLUSION

For the foregoing reasons, Saneman's motion to dismiss is **GRANTED in part and DENIED in part**, Comen's motion to dismiss is **GRANTED in part and DENIED in part**, Cassilly's motion to dismiss is **GRANTED in part and DENIED in part**, Picha's motion to dismiss is **GRANTED**, Harford County's motion to dismiss is **GRANTED**, and the Harford. County State's Attorney's motion to dismiss is **GRANTED**.

A separate implementing order will issue.

Dated: July 10, 2026

_____/s/_____
Brendan A. Hurson
United States District Judge

58